## SUPREME COURT — APPELLATE DIVISION — SECOND DEPARTMENT.

### June 6, 1919.

## THE PEOPLE EX REL. NUNNS v. COUNTY COURT, NASSAU CO. ET AL.

### (188 App. Div. 424.)

(1) CRIMINAL CONTEMPT—MISCONDUCT OF JUROR IN TRIAL OF INDICTMENT.

Relator had been ·drawn as a petit juror to try an indictment against persons charged with keeping a ''cafe'' as a disorderly house and a public nuisance.  He was informed by the district attorney that the prosecution sought an indifferent jury of whom none was acquainted with the defendants or the reputation of their place of business.  In response to specific questions put to him, he replied that he did not know the defendant, or either of them, and that he knew nothing of their place.  He was sworn as a juror, sat throughout the trial and took part in the verdict.  After the case had been submitted and the jury sent to their room, relator stated to his fellow-jurymen that he knew the defendants, and their place, that he had visited it several times, and that in his opinion it was all right.  After an acquittal on the indictment, the court before whom it was tried heard evidence and found relator guilty of criminal contempt of court.

*Held*, that an appeal from such determination should be dismissed.

(2) ·TRIAL—WITNESS.

Petit jurors who sat in the trial of an indictment are not incompetent as witnesses on proceedings against one of their number for criminal contempt.

(3) ACQUITTAL IN CRIMINAL PROSECUTION.

A verdict of acquittal in a criminal prosecution is a finality, and a proceeding for contempt against one of the jurors who rendered the verdict is not an attack thereon and does not render the testimony of the jurymen incompetent on the question of the juror's innocence.

(4) JURY—VIOLATION OF SECRECY OF JURY ROOM.

The secrecy of the jury room is not violated by allowing jurors who sat in the trial of an indictment to testify in contempt proceedings as to the misconduct of one of their number in giving false answers as to his qualifications, which amounted to a violation of his oath, where said proceedings in no way relate to the verdict.

*It seems*, that neither reason nor policy should extend the protection of sanctity to the jury room so as to shield even the briber or the bully, provided he attempted his work during the period of deliberation.

(5) AUTHORITY OF DECISIONS OF U. S. SUPREME COURT. IN ABSENCE OF STATE DECISIONS.

In the absence of decisions of the State courts, cases of the United States Supreme Court are of the highest persuasive authority and even a' *gratis dictum* therein is entitled to the greatest respect. This is especially true when the question presented is one of general policy.

(6) CIVIL RIGHTS LAW SECTION 14, WHEN NOT VIOLATED BY QUESTIONING A JUROR FOR MISCONDUCT AND VIOLATION OF OATH.

Section 14 of the Civil Rights Law, providing that a juror shall not be questioned and is not subject to an action, or other civil or criminal liability for a verdict rendered by him, etc., except by indictment, is not violated by questioning a juror in proceedings for contempt for misconduct and violation of his oath, and not for the verdict rendered.

(7) JUROR—FALSE STATEMENT BY, AS TO KNOWING DEFENDANTS.

A false statement by a petit juror in the trial of an indictment in the presence of the court, that he did not know the defendants or whether their place was of ill repute, together with the testimony of fellow-jurymen as to his contradictory statements, and assertion of acquaintance with the defendants and the reputation of their place, constitute competent proof of criminal contempt.

(8.) SAME.

In proceedings for criminal contempt of a petit juror who sat in the trial of an indictment, and who stated to the district attorney that he did not know the defendants or the reputation of their place, but who later stated in the jury-room that he knew them and that their place was all right, the misconduct of the juror was complete whether the statements were false or true.

(9) SAME—JUROR MUST NOT STATE TO JURY HIS KNOWLEDGE OF THE ISSUE ON TRIAL.

A juror sitting in the trial of an indictment may not state to the jury his personal knowledge as to the very issue on trial, and declare therefrom his belief in the innocence of the defendant.

(10) JUDICIARY LAW, SECTION 750.

Section 750 of the Judiciary Law, defining criminal contempt, does not purport to define or describe the specific acts which shall constitute criminal contempt.

(11) JUROR—FALSE ANSWERS BY AS TO ACQUAINTANCE WITH PARTIES.

False answers given by a juror to the district attorney concerning his acquaintance with the defendants and knowledge of the reputation of their place, made in the presence of the court, were within the statutory words "tending * * * to impair the respect due to its authority."

(12) SAME.

A juror who informs the district attorney in the presence of the court that he does not know the defendants, or the reputation of their place, but later in the jury room admits acquaintance with the defendants and asserts that he has visited their place and that it was all right, is guilty of contemptuous behavior towards the court.

(13) SAME—THAT HE WAS NOT SWORN IMMATERIAL.

That a petit juror was not sworn when he gave false answers as to his qualifications to sit in the trial of an indictment is immaterial.

(14) SAME—SUBMITTING TO HEARING WAIVES DEFECTS IN PRELIMINARY PROCESS.

Where in proceedings for criminal contempt the contemnor appears and submits to a hearing on the merits, he thereby waives any defects in the preliminary process, and confers jurisdiction of the person.

(15) APPEAL—DOES NOT LIE FROM ORDER DECLARING CRIMINAL CONTEMPT.

An appeal from an order declaring a criminal contempt committed in a criminal case does not lie. The proper remedy is by certiorari.

PUTNAM AND KELLY, JJ., dissented, with opinions.

CERTIORARI issued out of the Supreme Court and attested on the 21st day of August, 1918, directed to the County Court of Nassau county and Hon. Lewis J. Smith, county judge of Nassau county, commanding them to certify and return to the office of the clerk of the county of Nassau all and singular their

proceedings had in punishing the appellant, Thomas B. Nunns, for a criminal contempt of court.

Also an appeal by Thomas B. Nunns from an order of the County Court of Nassau county, entered in the office of the clerk of said county on the 15th day of August, 1918, adjudging him guilty of a criminal contempt of court.

*Harry G. Clock,* for the appellant.

*Charles I. Wood, Assistant District Attorney [Charles R. Weeks, District Attorney,* with him on the brief], for the respondents.

JENKS, P. J.:

This is certiorari of proceedings that adjudged the relator guilty of a criminal contempt. The relator also appeals. For reasons hereinafter stated, I advise dismissal of the appeal. The contemnor was a petit juror on the trial in the County Court of Nassau county of an indictment against the Schwabs for keeping a "café" as a disorderly house and a public nuisance. After the jury had acquitted the defendants, the contempt proceedings were begun by order to show cause based upon affidavits. The relator appeared upon the return day personally and by counsel. The judge who had sat upon that trial conducted this hearing. Witnesses were examined and cross-examined. The relator offered no evidence, but rested his case upon various motions.

The final order rests upon the following facts: The relator, after drawn as a petit juror, was informed by the assistant district attorney that the prosecution sought an indifferent jury of whom none was acquainted with the defendants or their place then charged as disorderly, and none had knowledge of the defendants or of that place. Thereupon, in response to specific questions put to him, the relator answered that he did not know the defendants or either of them, and that he knew nothing of

their place.  Thereafter the relator was sworn, sat throughout the trial and took part in the verdict.  After the case had been submitted to the jury and they had been sent to their room, the relator there stated to his fellows or some of them, that he knew the defendants and their place, that he had visited it several times and that in his opinion it was all right and a correct place.  The court found that the said answers made to the assistant district attorney were false, that the conduct of the relator was deliberate in the court room and in the jury room, and that his said behavior constituted a criminal contempt of court.

My discussion presents three questions:  *First,* was there evidence?  *Second,* was there proof?  *Third,* was there a criminal contempt?

*First.*  One of my brethren contends that the witnesses called were incompetent because they had been jurors in the case in which the relator had demeaned himself as a contemnor.  My answer is that there is no rule or principle of evidence, case made or statutory, that sustains the dissentient; but that both persuasive authority and reason made these persons competent witnesses in this proceeding.  Examination of all the cases cited by my brother, and, I venture to assert, all others in this state and, indeed, outside of it where the rule of exclusion has been applied, will show procedure of attack upon the *verdict,* and that the witnesses or affiants were excluded, not because they were or had been jurors, but because they could not be heard to impeach their verdict.  The text writers are cited where they are in consideration of the like condition.  If so, then the cases cited are neither precedents nor authorities in the case at bar, for the reason that the verdict had been rendered before these proceedings were begun.  Such verdict in this state was a finality, for it was one of acquittal in a criminal case, and hence these proceedings were not, and could not be, directed against the verdict.  The verdict was not involved—not even a feature in the proceedings.  The conduct of the relator bore no

relation to the verdict rendered; it could have occurred in every detail whether the verdict was one of acquittal or of conviction, or if the jury had disagreed. The relator was not brought to book because of his verdict, or because of his part in the rendition of it.

Of the cases cited in the dissenting opinion, Smith v. Cheetham (3 Caines, 57) is authority for admissibility even in proceedings against the verdict; and Clum v. Smith (5 Hill, 560), Williams v. Montgomery (60 N. Y. 648), and Hewitt v. Chapman (49 Mich. 4), are cases of direct attack upon the verdict, wherefore the jurors were excluded from impeachment of it. I cannot find that Smith v. Cheetham (supra), was ever directly overruled, although Sutherland, J., in Sargent v. ————— (5 Cow. 106), says that it must be deemed to be overruled in Dana v. Tucker (4 Johns. 487), where, however, it is not even mentioned. But my brother says that Kent, Ch. J., dissented in Smith v. Cheetham, and that his view prevailed in New York. My brother then cites Clum v. Smith (5 Hill, 560), and Williams v. Montgomery (60 N. Y. 648), which cases presented direct attacks upon the verdict. Kent, Ch. J.'s dissent in Smith v. Cheetham (supra), which is limited to exclude willfulness and fraud, rests upon Vaise v. Delaval (1 Term. R. 11) alone. And the latter case is cited in Clum v. Smith (supra), together with Owen v. Warburton (1 Bos. & Pull. [N. C.] 326), and Dana v. Tucker (4 Johns. 487). Clum v. Smith, with Coster v. Merest (3 Brod. & Bing. 272), are the two cases cited in Williams v. Montgomery (supra).

Vaise v. Delaval seems the pioneer case. To my mind it is neither precedent nor authority here. A motion was made to set aside a verdict upon affidavits of two jurors that the jury, being divided in their opinion, tossed up and the plaintiff's side won. Lord Mansfield, Ch. J., in an opinion of six lines, decided that the court could not receive such an affidavit from any of the jurymen, "in all of whom such conduct is a very

high misdemeanor," but in every such case the court must derive their knowledge from some other source, "such as from some person having seen the transaction through a window or by some such other means," and the rule was refused.   This decision was examined at great length and disapproved so far as it expressed a general rule, by Livingston, J., in Smith v. Cheetham (supra), who wrote one of the prevailing opinions, and the decision was evidently disapproved by Spencer, J., who likewise wrote.   Livingston, J., declared it no precedent, in that it had been decided since the Revolution.   An eminent writer on evidence discusses Vaise's case at length, and protests against its misapplication as stating the general rule, especially at his section 2352.   (Wigm. Ev.)   I have thus noticed it for the reason that it is cited by Kent, Ch. J., dissenting in Smith v. Cheetham (supra) and also in Clum v. Smith (supra).   In addition to the citation of Vaise's case in Clum v. Smith (supra), there is cited Owen v. Warburton (supra).   This is a decision by Sir James Mansfield, Ch. J., who refused affidavits of the jurors to show that the verdict had been rendered by lot, lest it might prompt some juror, friendly to a party, to propose such scheme and then, when chance decided it against his friend, to upset the verdict by revelation of the method.   In Williams v. Montgomery (supra) the Court of Appeals in its memorandum decision that declared jurors could not be heard to impeach their verdict, cited only Clum v. Smith and Coster v. Merest (supra), which was a rule *nisi* for a new trial when the Court of Common Pleas refused affidavits from the jurymen, thinking it might be of pernicious consequence in any case. Under the penalty of reiteration, I point out that in every case mentioned there was a *direct attack upon the verdict,* and that the jurymen were rejected because they would not be heard to *impeach their verdict.*

Vaise's case (supra) does not decide any principle that applies to the case at bar, and it does not contain any *dictum* or reason that supplies an argument by analogy.   And for the

reason that Vaise's case was a direct attack on the verdict, the jurors were refused as affiants because they showed that all of the jurors, including the affiants, were guilty of a high misdemeanor, while in the case at bar there was not and there could not be any attack upon the verdict, and the witnesses testified to the isolated piece of misconduct of one of their number independent from any action on their part.    I find in none of the cases any decision or *dictum* or expression that justifies the exclusion of these witnesses, provided there is no attack upon the verdict.    And even, as I have shown, in an attack upon the verdict in Smith v. Cheetham (supra), the court denied the application of Vaise's case.    I am not contending against decisions, but I am showing that there is none in point or in reasoning that makes against me in the case at bar.

But it is also said by my brethren that the principle of the secrecy of the jury room must prevail.    The public policy of this principle of secrecy is in the furtherance and assurance of free, fearless and untrammeled deliverance upon the evidence, and for that reason the proceedings of the jurors preliminary to the verdict—the talk, discussions, informal votes and the like—are declared inviolable for all time.    Such doings are within the discharge of the duty cast upon the jury to decide the case upon the evidence.    Such doings preliminary to the verdict are merged in it, and are inherent in it as the *vere dictum*.    But conduct of a juror during the deliberations aimed to secure a particular verdict, by which in violation of his oath he should "avail himself of the opportunity of adding to or detracting from the evidence by means of his own peculiar knowledge of any of the circumstances attending the transaction submitted to their consideration," which "would * * * violate his duties" (Daniels, J., in People v. Zeiger, 6 Park. Crim. Rep. 355, 357), should not be contemplated as if preliminary to the verdict and inherent in it, but—to quote the language of Cole, J.—such doing is a matter that does not "essentially

inhere in the verdict itself." (Wright v. Illinois & Mississippi Telegraph Co., 20 Iowa, 195, 210.)   This expression is approved by Wigmore on Evidence, section 2353.   I see no justifiable reason, then, for the inclusion of such *misconduct*— a violation of oath and of function—as within the protection afforded to proper conduct, namely, due deliberations upon the evidence.   I cannot see that the jurors would be deterred from full and free performance of their duties if such misconduct might be brought to light by their testimony.   I cannot see that the jurors' discharge of their lawful duties is safeguarded by immunity to one of their number who willfully violates those duties.   The honest juror need have no fear of exposure even of his own part, if the principle is confined to its reason.   The corrupt juror need have no fear of exposure, if the principle is extended beyond its reason.

How could exposure of the wrongdoer interfere with the principle that the legitimate discharge of the lawful doings of the jury preliminary to the verdict should not be disclosed? The jurors are not to be regarded as informers, but as witnesses summoned to testify.   If they are not called to impeach their verdict, why should they be excluded as witnesses, to the end that the wrongdoer may escape unless it chance that some outsider may learn of his misconduct through a window (see Lord Mansfield, in Vaise's case, supra), or an eavesdropper happen to sit squat at the keyhole.   I perceive no reason why the misconduct should be limited to acts, in contradistinction to words. Words are things, and wrongs may be worked by them.   Should drunkenness of a juror be liable to exposure, and words whereby, *e. g.*, a juror should offer $1,000 apiece to his fellows for a verdict for his friend, or should threaten that violence would follow any juror who voted against such friend, be protected—because such words are uttered while the jury are deliberating?   There is no tangible proof of either misconduct other than the testimony of the jurors.

I find most persuasive authority for my contention in the

Supreme Court of the United States in cases which *even presented direct attacks upon the verdict.* (Mattox v. United States, 146 U. S. 140; McDonald v. Pless, 238 id. 264, 268, 269.) In McDonald v. Pless (supra) the unanimous court, per Lamar, J., said: "The rule on the subject has varied. Prior to 1785 a juror's testimony in such cases was sometimes received though always with great caution. In that year Lord Mansfield, in Vaise v. Delaval (1 T. R. 11), refused to receive the affidavit of jurors to prove that their verdict had been made by lot. That ruling soon came to be almost universally followed in England and in this country. Subsequently, by statute in some states, and by decisions in a few others, the juror's affidavit as to an overt act of misconduct, which was capable of being controverted by other jurors, was made admissible. And, of course, the argument in favor of receiving such evidence is not only very strong but unanswerable—when looked at solely from the standpoint of the private party who has been wronged by such misconduct. The argument, however, has not been sufficiently convincing to induce Legislatures generally to repeal or to modify the rule. For, while it may often exclude the only possible evidence of misconduct, a change in the rule 'would open the door to the most pernicious arts and tampering with jurors.' 'The practice would be replete with dangerous consequences.' 'It would lead to the grossest fraud and abuse' and 'no verdict would be safe.' (Cluggage v. Swan, 4 Binn. 155; Straker v. Graham, 4 M. & W. 721.) There are only three instances in which the subject has been before this court. In United States v. Reid (12 How. [U. S.] 361, 366), the question, though raised, was not decided because not necessary for the determination of the case. In Mattox v. United States (146 U. S. 140, 148), such evidence was received to show that newspaper comments on a pending capital case had been read by the jurors. Both of those decisions recognize that it would not be safe to lay down any inflexible rule because there might be instances in which such

testimony of the juror could not be excluded without 'violating the plainest principles of justice.' This might occur in the gravest and most important cases; and without attempting to define the exceptions, or to determine how far such evidence might be received by the judge on his own motion, it is safe to say that there is nothing in the nature of the present case warranting a departure from what is unquestionably the general rule, that the losing party cannot, in order to secure a new trial, use the testimony of jurors to impeach their verdict. The principle was recognized and applied in Hyde v. United States (225 U. S. 347), which, notwithstanding an alleged difference in the facts, is applicable here. *The suggestion that, if this be the true rule, then jurors could not be witnesses in criminal cases, or in contempt proceedings brought to punish the wrongdoers is without foundation. For the principle is limited to those instances in which a private party seeks to use a juror as a witness to impeach the verdict.*" The italics are mine.

Of course, if there were contrary or conflicting decisions in our own state we would follow them in the absence of direct decision of the United States Supreme Court upon a question within its jurisdiction. But in the absence thereof, these cases in the United States Supreme Court are of the highest persuasive authority, and even a *gratis dictum* therein is entitled to the greatest respect. Moreover, when the question presented is one of general policy, *a fortiori* should we respect the declarations of the highest court of our land. (See remarks of Duer, J., in Stoddard v. Long Island R. R. Co., 7 N. Y. Super. Ct. 180, 188; Bell v. Perkins, 7 Penn. [Peck], 261, 263.)

It seems to me that the learned and scholarly dissent characteristic of my brother Putnam is beside the mark. I could concur with him had the verdict been attacked, despite the authorities *contra,* for although the false answers were not made in the jury room the jurors were necessary witnesses to

justify the finding of falsity. I would concur with him if the *mis*conduct in the jury room should be resolved as of the deliberations of the jury upon the case as presented to them by the evidence, which alone it was their sworn duty to consider. But I think that neither reason nor policy should extend the protection of sanctity so it would shield even the briber or the bully, provided he attempted his work during the period of deliberation.

The dissent of my brother Kelly is put upon the ground that the proceedings against the relator were in violation of section 14 of the Civil Rights Law, which is as follows: "A juror shall not be questioned, and is not subject to an action, or other liability, civil or criminal, for a verdict rendered by him, in an action in a court of record, or not of record, or in a special proceeding before an officer, except by indictment, for corrupt conduct, in a case prescribed by law." I have heretofore attempted to show that this juror was not *questioned for a verdict,* and that he was *not subjected* to these proceedings *for a verdict.*

I think there should be no question as to the competency of these jurors as witnesses, when the feature of attack upon the verdict is not in the case. In Canal Bank of Albany v. Mayor, etc., of Albany (9 Wend. 256), the court, per Nelson, J., say: "In the case of Smith v. Cheetham (3 Caines, 57), no doubt was entertained by the court as to the competency of the confessions or admissions of the jury, if their own affidavits were admissible, and the *only difficulty* was the rule which rejected the evidence of the jurors themselves to impeach their verdict." (See, too, Harris v. State, 24 Neb. 803, 809.) The statements of the relator were admissible. (Dodge v. State, 24 N. J. Law, 455, 461; State v. Williams, 30 Mo. 364. See, too, Richards v. State, 36 Neb. 17, 28; Ellis v. State, 33 Tex. Cr. Rep. 508.)

The case at bar is a practical illustration of the rule which I maintain. The verdict of acquittal had been rendered and

the defendants thereby were freed.   Thereafter these proceedings were begun in criminal contempt for false answers as to qualifications as a juror, and for misconduct as a juror. The proceedings in no way related to the verdict.   Persons who had been jurors were called as witnesses.   At the outset the court said to them: "Before you answer any questions I think that it is well that I should state to you what the object is for calling you here.   I do not propose to permit either counsel to inquire of you how you reached your decision in the Schwab case.   That is your own private matter, and we will assume that you reached your decision upon your best judgment." Their examination followed.   Here was no analogy to the judges *tempore* Stuart Kings.   All that the witnesses testified to was the declarations of the juror as to his personal knowledge and as to his belief founded thereon of the defendants' innocence.   As we have seen, such testimony could not be considered as openly or covertly an attack upon the verdict.   It did not reveal any of the doings or the sayings of the jury in consideration of the evidence.

*Second.*   Was there proof of the facts?

Criminal contempts in a criminal matter are declared within the purview of article 7 of title 2 of chapter 16 of the Code of Civil Procedure, by section 2148 of that Code.   Therefore, we must consider whether there was any competent proof of all the facts necessary to be proved in order to authorize the making of the determination, and if there was such proof, whether there was upon all the evidence such a preponderance of proof against the existence of any of those facts that the verdict of a jury affirming the existence thereof, rendered in an action in the Supreme Court triable by a jury, would be set aside by the court as against the weight of evidence.   (Code Civ. Proc., § 2140.)   The rule of Gompers v. Bucks Stove & Range Co. (221 U. S. 448) afforded to the relator the presumption of innocence, required proof of guilt beyond a reasonable doubt, and protected him from testifying against himself.   The

proof that the relator made the answers that he did not know
the defendants or their place was within the personal knowledge
of the court, is thus returned and hence is conclusive. (People
ex rel. Barnes v. Court of Sessions, 147 N. Y. 296, 11 N. Y.
Crim. 460.)    The proof of the statements of the relator to
the jurors in their jury room appears in the testimony of
several of the jurors, which was direct, unshaken on cross-
examination, and was not contradicted.

As to the falsity of the answers to the assistant district
attorney, the court as a trier of the facts had proof that the
relator within the brief time that intervened his call as a petit
juror and his verdict had made self-contradictory statements—
not contrary, but contradictory.    There was no direct proof
which of these contradictory statements was false.    The court
very properly could consider the surrounding circumstances of
the two contradictory statements.    It could consider the fact
that after the relator had become a juryman he informed his
fellows, when they were in deliberation upon their verdict, that
he did know the defendants and their place.    The court might
well have been at a loss to find explanation for such behavior
in the jury room by a juryman who knew nothing of the
defendants or of their place, for *his* natural course would be to
discuss the evidence, not to state falsely that he did know the
defendants and their place and then attempt to give, as if from
such knowledge, a personal opinion that made for acquittal.
There is no suggestion of embracery or like improper pressure
upon this juror.    On the other hand, explanation of such con-
duct could be found in the fact that the juror did know the
defendants and their place and had visited it.    He might be a
partisan of the defendants beyond the consideration of the
evidence.    He might have formed an honest opinion of the
defendants' innocence from his personal knowledge, despite the
evidence.    On the other hand, the relator could not thus serve
the defendants unless he gained place in the jury box.    This
conduct as a juror disclosed a motive to become a juror.    If a

sound definition of conduct is "acts adjusted to ends" (Spencer's Data of Ethics, 4), the court could conclude that the relator would have lied to the assistant district attorney rather than to his fellow jurymen. And for the reason that the relator had been warned by him who had the right of challenge that the people desired none but strangers to the defendants and their place as jurymen, and, therefore, relator's admission of such knowledge presented him as objectionable to the people. And, on the other hand, the court could have considered that the relator could not have aided the defendants in the jury room, save by discussion of the evidence, if he was a stranger to the defendants and their place. Thus falsehood in the court room and truth in the jury room best served the purpose of the relator as indicated by his conduct in the jury room. Acts speak as well as witnesses. Further, falsehood in the examination did not show much temerity. There is no proof that the relator was sworn on the *voir dire,* and hence there was no pain of perjury. There was no great probability of detection, for the defendants lived and kept their place in a town or village other than that wherein the court was held. Moreover, the relator as a juryman likely enough could have supposed that his statements made in the secrecy of the jury room to his fellow jurors might never come to light. There is no support for the suggestion of the learned counsel that the relator may have visited the place after he was sworn as a juror and thus have become first acquainted with the defendants and their place, after he had denied any knowledge of them or of it to the assistant district attorney. On the other hand, the juror Doncourt was asked on cross-examination: "Q. When did he say he had been in the place? A. I don't know that he made any statement as to the time, prior to the trial, of course." As to the statements in the jury room, the misconduct was complete whether the statements were false or true.

I think that the court was justified in finding the conduct of

the relator both in his examination and in the jury room was in its nature deliberate—a term that implies action after thought and reflection, and relates to the end proposed (People v. Hawkins, 109 N. Y. 411; Bouvier Law Dict. [Rawle's 3d Rev.], "Deliberate.")    Such finding but implies that the relator made false answers for the purpose of being accepted as a juror and attempted, in violation of his oath as a juror, to impress his fellow jurors as to the innocence of the defendants by his personal knowledge of them and of their place.

It is suggested that these utterances in the jury room may have been in casual conversation, innocent of any purpose. Perhaps mere assertion of acquaintance with the defendants and their place could or even should have been so regarded. But the statement of acquaintance was preliminary, followed by the expressions that the place was all right and was a correct place, a declaration of the relator's belief in the innocence of the defendants.    Certainly concessions cannot go further than to admit that the entire conversation was equivocal, and thereupon we are confronted with the rule declared for the court by Denio, J., in People v. Hackley (24 N. Y. 78): "The question whether the alleged offender really committed the act charged will be conclusively determined by the order or judgment of the court; and so with equivocal acts, which may be culpable or innocent according to the circumstances; but where the act is necessarily innocent or justifiable, it would be preposterous to hold it a cause of imprisonment."

It is suggested that the "conviction" of false statements to the assistant district attorney rests upon a "confession" of the relator without additional proof.    But proof of the said statements made to the jurors in the jury room was not proof of a confession.    Testimony that another did or said a thing is not testimony that he "confessed," for such testimony is not as to what the other said he had done or had said in the past, but as to what the witness saw or heard the other do or say at a time then present.    On consideration of all of the evidence, I think

that within the rules heretofore stated it was sufficient to satisfy the court as "to the guilt of the defendant, so as to exclude any other reasonable conclusion." (See Hopt v. Utah, 120 U. S. 430, 441.)

The suggestion that a juror with impunity may bring to bear his own experience in the doings of life does not make for the relator. His offending was that he stated to the jury, then in consideration of the verdict, his personal knowledge, as to the very issue on trial, and declared from this personal knowledge his belief of the innocence of the defendants. (See Lenahan v. People, 3 Hun, 164; affd., on opinion of Daniels, J., 62 N. Y. 623.) If a juror have knowledge of the very issue, he cannot in effect become a witness unsworn and not cross-examined. Section 413 of the Code of Criminal Procedure provides: "If a juror have any personal knowledge, respecting a fact in controversy in a cause, he must declare it in open court, during the trial. If, during the retirement of the jury, a juror declare a fact, which could be evidence in the cause, as of his own knowledge, the jury must return into court. In either of these cases, the juror making the statement must be sworn as a witness, and examined in the presence of the parties." The rule and the reasons are well stated in Schmidt v. New York Union Mutual Fire Ins. Co. (1 Gray, 529, 535). And Daniels, J., writing for the General Term in People v. Zeiger (6 Park. Cr. Rep. 357) says: "This is required by two prominent considerations: 1st. That the evidence shall be given under the sanction of an oath. 2d. That the parties may have an opportunity of knowing on what evidence the jury are to act; and a juror who should, after the jury have retired to their deliberations, avail himself of the opportunity of adding to or detracting from the evidence by means of his own peculiar knowledge of any of the circumstances attending the transaction submitted to their consideration, would not only violate his duties, but he would also be utterly unfitted for the position he was called upon to occupy."

*Third.* Did the facts justify a finding of criminal contempt?

In determining whether the behavior of the relator was a criminal contempt we must look to the statute only. (People ex rel. Munsell v. Court of Oyer & Terminer, 101 N. Y. 245.) This is section 750 of the Judiciary Law. The part pertinent is subdivision 1, that reads: "Disorderly, contemptuous, or insolent behavior, committed during its sitting, in its immediate view and presence, and directly tending to interrupt its proceedings, or to impair the respect due to its authority." The statute does not purport to define or to describe the specific acts of behavior that constitute the contempt. The possible variations of conduct practically forbade "disorderly." "Disorderly," "contemptuous," "insolent," are all general terms. I think that "disorderly" and "insolent" imply contumacy or the like, and are not applicable, but that we must confine ourselves to "contemptuous." Contempts of the character now under consideration have been ascribed to violations "of the rights of the public as represented by their constituted legal tribunals," "an offense against the court, as an organ of public justice," "an act tending to impede or frustrate the administration of justice," "a violation of the rights of the public as represented in their judicial tribunals," "committed against the majesty of the law or against the court as an agency of government," and "words or acts obstructing or tending to obstruct the administration of justice." (People ex rel. Munsell v. Court of Oyer & Terminer, 101 N. Y. 245; Yates v. Lansing, 9 Johns. 417; Black's Law Dict.; People ex rel. Gaynor v. McKane, 78 Hun, 161; State ex inf. Crow v. Shepherd, 177 Mo. 205; 7 Halsbury's Laws of England, 280.)

And first as to the behavior under examination as a juror. Indifference is an element of a jury. (Capital Traction Co. v. Hof, 174 U. S. 15.) Our statute prescribes it. (Code Crim. Proc., § 387.) To that end is the right of challenge and with it the right of examination. In the case whence this proceeding arose, the counsel in charge of the prosecution declared

to the relator, after he was drawn as a juror, that the people desired an indifferent jury (as was their right), which was sought in a jury of those who did not know the defendants or their place then charged as disorderly. Thus the officer charged by law in the first instance to see that a jury was satisfactory to the people had informed the relator of an objectionable feature as far as the people were concerned in any man proposed as juryman in that case. If the relator did know the defendants and their place, he had fair notice that he was objectionable from the viewpoint of the people. He was chargeable with notice that his avowal of such knowledge might prompt further questions aimed towards bias, or subject him to a challenge peremptory; on the other hand, his disclaimer of such knowledge would naturally satisfy his examiner as to any objection founded upon that knowledge. If the relator appeared as of the first twelve persons approved as indifferent, he must be sworn. (Code Crim. Proc., § 387.) This falsehood of the relator represented him as an indifferent juror, so far as a test applied by the people was concerned. And so far this falsehood tended to impede or to frustrate the administration of justice, to violate the rights of the people as represented in their legal tribunal that was to be constituted by a judge and twelve *indifferent* jurymen. This falsehood was uttered during the sitting of the court and in its immediate view or presence. And I think that such behavior was within the statutory words "tending * * * to impair the respect due to its authority." The authority of the court is the official power of the court. (Anderson's Law Dict., "Authority.") The official power of the court was to try the indictment with a jury. The securing of the jury prescribed by law was within the authority committed by law to the court in the last instance, and was within its supervision. And this was a falsehood by a proposed juror, conscious that the purpose of the inquiry was as to his indifference, whereby he impaired the respect due to the court which required the truth.

And second as to the behavior in the jury room.    The relator had taken the oath as a juror which "gives the measure of his duty.    He is to well and truly try the issue joined," etc. (Elbert, Ch. J., for the court, in Stratton v. People, 5 Col. 276, 277.)    The return shows that he had answered the assistant district attorney that he would try the cause only upon the evidence given by the witnesses, but he did not. Nor did he leave his fellows so to do, in that he declared to them during their deliberations that he knew the defendants and their place, that he had visited it on several occasions and that in his opinion the place was all right and correct.    Thus avowedly upon his personal knowledge he gave evidence as a witness upon the very issue, namely, whether the defendants kept that place as a disorderly house and a public nuisance. He departed from his office as a juror, to demean himself while a juror as a witness unsworn and not cross-examined, or as an advocate.

Such behavior was during the sitting of the court, and in its immediate view and presence (People ex rel. Choate v. Barrett, 56 Hun, 351; affd., 121 N. Y. 678), and I think that such behavior was contemptuous.    The kind of contempt as is within the purview of the statute has further been described as a willful attempt of whatsoever nature to influence jurors improperly in the impartial discharge of their duties, whether it be by conversation or discussions.    (9 Cyc. 15, cited in Emery v. State, 78 Neb. 547, 9 L. R. A. [N. S.] 1124.    See, too, State v. Jones, 29 S. C. 201, 233.)    I fail to perceive why the circumstance that the offender was a juror can affect the principle.    It seems to me *a fortiori* that such act was flagrant. The pertinent principle may be found in the leading case of People ex rel. Munsell v. Court of Oyer & Terminer (supra). The charge against Petit Juryman Munsell was that *he* privately visited the scene of the affray.    Although it had been alleged that he had made that visit against the orders of the court, *it was conceded* that there had been no order of the court.

In the course of the discussion, the court, per Finch, J., in comment, says: "On the face of the order it is recited that he willfully disobeyed the command of the court. *If that was true there was a criminal contempt;* but it is here conceded not to be true, and that no order of the court was disobeyed." The principle that survives is this: If, as declared, *Munsell* would have been guilty of a criminal contempt had there been an order of the court, this juror was guilty of a criminal contempt in that he disobeyed his oath to determine the case only upon the evidence. The obligation of the oath had as much legal solemnity as the order of the court—both regulated the duty of the juror. And I think that such behavior went to impair the respect due to the authority of the court. At the time in question the court in the contemplation of the law consisted both of judge and jury. The authority of the jury was the power to decide the case upon the evidence given by the witnesses. And with such power was correlated the duty to consider the evidence only. If this juror wittingly sought to influence the jury by matters extrinsic to the evidence, his act tended to impair the respect due to the authority of the court.

The return does not show that the relator was sworn before he made the answers as to his qualifications. But I think that the question of his contempt in his false answers would not be affected if those answers were made without oath. The oath is not a prerequisite, for its purpose is to subject the falsifier to the pains of perjury (Bouvier [Rawle's 3d Rev.], 2566), and, under our statute, to eliminate challenge for actual bias. (Code Crim. Proc., § 376.) The effect of the answers, save upon the relator, was the same whether he was sworn or not. I perceive no logic in the proposition that the commission of perjury is essential to a contempt by false answers. I know of no rule, no requirement of statute, that a proposed juror must be sworn before he answers the questions as to his qualifications, at least in the absence of objection

or request.    I find no provision of statute law upon the subject, while the reference to the declaration on oath in section 376 of the Code of Criminal Procedure would seem to indicate that an oath was not in contemplation at the outset of an inquiry as to the expression or formation of an opinion, etc. In Zell v. Commonwealth (94 Penn. St. 258, 272), when the trial court allowed the prosecution to challenge jurors for cause on account of answers made without the jury having been first sworn on the *voir dire,* the court held that in the absence of objection, exception or request there was no error.    To the same effect, see State v. Hoyt (47 Conn. 518, 520); Bracken v. Preston (1 Pinney [Sup. Ct. of Wis.], 365, 368); United States v. Cornell (2 Mason, 91, 105).    In the case last cited, Story, J., says: "The objection, however, affects to place some reliance upon the fact that the jurors were not sworn or affirmed to the truth of their statements.    But this was surely unnecessary, where no doubt was entertained of their perfect veracity. I agree with the doctrine laid down in the book cited by the prisoner's counsel, that where the jurors challenge themselves, they *may* be sworn to the truth of their asservations.    (1 Chitty Criminal Law, 443.*)    But when these are undoubted, of what use can it be to make assurance doubly sure?    I may add, that in all the courts of New England, where I have seen practice, the course pursued on this occasion has been uniformly adopted.    I do not deny that the facts to establish a lawful challenge to the polls may be ascertained by *triors* according to the course of the common law;  all I assert is, that this is not the usual or necessary mode with us;  and least of all is it proper, where the facts are not disputed, and the cause of challenge is apparent and admitted, and resolves itself into a mere point of law."    It must be remembered that we have not before us any question of due procedure, or one that presents a request that the juror be sworn, or an exception to omission or refusal to administer an oath.

---

* 1st Am. ed.—[REP.]

It is contended by the learned counsel for the relator that the testimony of the jurors was not competent. This contention rests upon the rule that the jurors could not impeach their verdict—which I have attempted to show has no application in this case.

The learned counsel contends that the moving papers on the motion were a nullity and the proceedings void. This proceeding was instituted by an order to show cause upon affidavits. The relator appeared on the return day and was represented by counsel. He moved for dismissal on the insufficiency of the moving papers, and asked time for argument. The case was continued, but *it does not appear* that the motion was argued or pressed, and the court without objection proceeded with the examination of the jurors. The appearance and submission to a hearing on the merits was a waiver of any defects that might be in the preliminary process, and conferred jurisdiction of the person. (Bowman v. Seaman, 152 App. Div. 693, 694, 28 N. Y. Crim. Rep. 279 citing Sweeney v. O'Dwyer, 197 N. Y. 499; People ex rel. Barnes v. Court of Sessions, supra, 295.)

I am of opinion that an appeal from the order that declares a criminal contempt committed in a criminal case does not lie, but that the proper remedy is certiorari. (People ex rel. Taylor v. Forbes, 143 N. Y. 223. As to the general principle, see New Orleans v. Steamship Co., 20 Wall. 387, citing *inter alia* Crosby's Case, 3 Wilson, 188 [see pp. 202, 203, 204]; Dodd v. Una, 40. N. J. Eq. 672, 715.)

I advise dismissal of the appeal, and affirmance of the order.

Rich and Jaycox, JJ., concurred; Putnam and Kelly, JJ., read for reversal.

Putnam, J. (dissenting):

On July 11, 1918, a jury acquitted Louis Schwab and wife, after a trial lasting four days in the Nassau County Court, on

an indictment for keeping a disorderly house at Freeport.   On July 29, 1918, Thomas B. Nunns, one of this jury, was served with an order to show cause why he should not be punished for contempt.   This was based on the affidavits of Mr. Edwards, assistant district attorney, and of three members of the jury.

Mr. Edwards deposed that since the verdict rumors had come to him that Nunns "had stated to the jurors while in deliberation in the jury room, that the place was all right, because he had been there on many occasions with his wife, and that there was a much worse place in Freeport, and that certain Freeport people were jealous because Schwab was making a lot of money, and they wanted to put him out of business." Mr. Edwards also set out that before accepting Nunns as the ninth juror he had inquired if Nunns knew either of the defendants, if he had ever been in the place, which he answered in the negative, and that Nunns had stated that if accepted he would be governed by the evidence in the case.

After the trial, Mr. Edwards further deposed that he had this colloquy with Nunns: "Mr. Edwards: I understand Mr. Nunns that you were the whole jury; that you told them you knew all about the place.   Mr. Nunns: Well, I only told the truth, I did tell them all I knew about it, and that I had been there with my wife, and that I had never seen anything wrong. Mr. Edwards: Did you think that was fair?"

The affidavit continued: "Mr. Vandewater, the foreman of the jury, said he was surprised while the deliberation was going on, to think the District Attorney allowed a man with such prejudiced and so much alleged knowledge of the place, upon the jury, and deponent informed the foreman of the jury that he had been assured that said juror was an honest man. After the trial Thos. B. Nunns visited Schwab's place on several occasions.   Deponent further says that he has not found any reflect [sic] on any other juror and whatever effort [sic] this man Nunns had on the jury we cannot tell, but we do think a dishonest man upon the jury at this time, during the trial,

could plant disfavor of the People's case with the jury as they proceeded because on the first ballot the jury stood six-six."

The order required Nunns to show cause why he should not be punished "for contempt of this court in and out of its presence." Relator appeared by counsel, and moved to dismiss the proceedings. The court directed an adjournment, saying: "The District Attorney will subpœna the jurors and have them here at the next hearing."

On August fifth, the adjourned day, there were called and sworn nine members of the jury. Over objection and exception two of such jurors (Vandewater and Mullin) testified that Nunns had said to the jurors that he knew the people and had been in the place with his wife; four (Frank, Jackson, Doncourt and DeMott) that Nunns said he had been in the place or had been there more than once; two others (Foley and Siles) remembered no such statement. White (the remaining juror produced) said he had heard no such statement of Nunns in the jury room, but some time after the trial, when riding from Mineola to Freeport, Nunns had said that he had been with his wife in the Schwab place, and that he did not see anything the matter with it. Whether this was a visit before the trial did not appear. Doncourt's cross-examination, having been cited in part in the majority opinion, is in full as follows:

"Cross-examination by Mr. Clock: Q. Do you recall any question that was asked of him [Nunns] by the District Attorney before he became a juror? A. Why, no, I don't know, I paid no particular attention. By Mr. Edwards: Q. You recall that the District Attorney asked you and the rest of the jurors a great deal about their acquaintanceship with the defendant and their knowledge of the place? A. Yes. By Mr. Clock: Q. When did he say he had been in the place? A. I don't know that he made any statement as to the time, prior to the trial, of course." Thus the witness may have understood the question and his reply as referring to Nunns' *statement* prior to the trial.

None of these witnesses supported the moving affidavit as to the questions to Nunns before he was sworn as a juror, or as to Nunns' alleged replies.

The relator, standing on his exceptions to the competency of such conversations in the jury room, offered no testimony. The learned county judge found the relator guilty of a contempt for false statements about not knowing defendants, before he was taken as a juror; also for saying to his fellow jurors, while deliberating on the case, that he knew defendant Schwab, also the place of business, and that he had been in the place of business several times before the trial. (Matter of Nunns, 104 Misc. Rep. 350, 37 N. Y. Crim. 82.)

Accordingly, on August 15, 1918, Nunns was adjudged in criminal contempt and fined $150 or thirty days' imprisonment in the county jail.

A writ of certiorari to review these proceedings was sued out.

Here is a startling result. After a criminal trial has ended in an acquittal, a juror from the vicinage, whom the prosecutor regarded as influential in bringing about the disappointing result, is fined, with imprisonment in default of payment. While jurors were so fined under the Stuart Kings (Hawkins Pleas of the Crown, chap. 72, § 5; Hallam Const. Hist. vol. 2, chap. 13), such usurpation was stopped in 1671 by Vaughan, Ch. J., in Bushell's Case (Vaughan R. 135), where the jurors, for not convicting Penn and Mead of the crime of unlawful assembly, had been each fined forty marks.*

---

* As to the early practice of fining jurors, see Throckmorton's case, by Fitzjames Stephens, in Select Legal Essays (Vol. 2, p. 491). The full proceedings with the resolute jury which held out against convicting Penn and Mead are in Forsythe Trial by Jury, p. 154. Disapproval of the practice appears in 4 Bl. Com. 361. Neither in trials nor in the Star Chamber afterwards, have I found that a judge ever questioned a juror as to what they had said in retirement. In 1578 a juror was committed to the Fleet, and then fined, for so small a matter as eating confectionary after the jury had left the bar! (Welcden v. Elkington, 2 Plowden Rep. 516, 519.)—[NOTE BY THE COURT.]

In these proceedings the learned county judge did not have interrogatories presented, but caused the members of the jury to be subpœnaed and examined *viva voce* before him.   The relator was thus confronted with the witnesses against him, which is the preferable method with such peculiar charges.   (Gompers. v. Bucks Stove & Range Co., 221 U. S. 418, 444; Bate's Case, 55 N. H. 325; Staley v. South Jersey Realty Co., 83 N. J. Eq. 300, 307.)   But the vice, and fundamental error, was the inquisition into the privacy of the jury room, where what a juror says and how he votes is "within the seal of secrecy for all time."   (1 Bailey Habeas Corpus, § 96, pp. 378, 379; Wigm. Ev. § 2346; Whart. Ev. [3d ed.] § 601.)   How could justice be administered through results of free conference unless jurors understand "that their deliberations in the jury room are inviolable, and that the reasons for their verdict cannot be questioned?"   (Jones Ev. [3d ed. 1913] § 766.)

Ordinarily it is their verdict, not the discussion leading to it, that is the essential.   But if it were otherwise, the absolute privilege surrounding the jury's deliberations, as distinguished from overt acts, cannot be violated, without destroying the jury's constitutional purpose.   To subject them to such a questioning tends to restrain freedom of expression, so essential to full deliberation, if not to overawe them in discharge of their duty.

Although in 1805 a juror's affidavit was received in New York to show the misconduct in reaching a verdict by averaging the estimates of damage, Kent, Ch. J., dissented (Smith v. Cheetham, 3 Caines, 57), and his view has not only prevailed in New York (Clum v. Smith, 5 Hill, 560; Williams v. Montgomery, 60 N. Y. 648), but throughout the entire country save only in six jurisdictions.   (Wigm. Ev. § 2354; Jones Ev. [3d ed.] § 767, n. 92.)   It is also the rule in British dependencies.   (Oswald Contempt [ed. 1913], 212.)

The learned court from his own memory might recall the negative statements attributed to Nunns, before he was taken

upon this jury, but he could not know whether such statements were true or were false except by means of the testimony of the other jurors, when questioned as to their consultations. Hence this judgment purporting to convict the relator of criminal contempt must finally rest upon such testimony improperly received. It violated the ancient and recognized rule that when "the jury retire to deliberate upon their verdict to be given, their conversations and discussions,—their deliberations,—cannot be inquired into." (Hewett v. Chapman, 49 Mich. 4.) In Wharton's words: "The communications between jurors, referring to the case under consideration, as an official body, are privileged, and they cannot be compelled to testify to the same; nor will testimony be received to show their mistake, or to impeach their verdict." (1 Whart. Crim. Ev. [10th ed.] 1054.)

The wisdom that forbids to pry into the consultations of jurors especially applies in a criminal case. Suppose after conviction it were made to appear that against the statute and charge of the court one juror had forcibly commented to his fellows upon the failure of the accused to be sworn, could the court punish such remark, or even permit it to be the subject of inquiry?

Furthermore, this is a matter of complaint which, in Coke's words, "was never seen before." Punishment for contempt is here applied to acts not external to the deliberations of the jury, nor to overt acts, like drunkenness (Perry v. Bailey, 12 Kan. 539), but to the intimate and free conversations between jurors in which expressions of personal knowledge passed before arriving at their verdict. There is no outside proof that before the trial the relator had declared a bias or partisanship, as in Hyman v. Eames (41 Fed. Rep. 676), which cannot be deemed an authority here.

The jurisprudence of New York has jealously guarded the privacy of a jury's consultations. In civil cases New York abolished "attaints upon untrue verdicts" (Act of March 30, 1801; Laws of 1801, chap. 90, § 28; 1 K. & R. 358, § 28)

about twenty-five years before that strange process of investigating juries' actions was finally repealed in England.   (6 Geo. IV, chap. 50, § 60.)

Our Revised Statutes set strict bounds upon courts' investigation of the jury room by this provision:   "Attaints upon untrue verdicts are abolished; and for any verdict rendered by him, no juror shall be questioned, or be subject to any action or proceeding, civil or criminal, except to indictment for corrupt conduct in rendering such. verdict, in the cases prescribed by law."   (2 R. S. 421, § 69.)

The revisers' note to this called "the residue new, but declaratory of a principle that has been sometimes disregarded." (Revisers' Reports, vol. 5, p. 65.)

Jurors are protected from inquisition and punishment save by process under indictment with jury trial by a like provision in our Civil Rights Law (Consol. Laws, chap. 6; Laws of 1909, chap. 14), section 14, in that it wholly drops the qualifying words "in rendering such verdict."   Hence the Legislature has unmistakably left misconduct of jurors to be dealt with under the established methods of the criminal law.

My real difference with my brethren is whether these provisions can be disregarded if only the verdict be not technically affected.   After a jury has been discharged, can the prosecution call up the jurors and demand to have them sworn again to testify how and by what arguments they finally voted not to convict?   What would be left of the moral value of an acquittal, if the jurors, or one of them, could be fined·for participation in this result?   The distinction as to such inquisition (hitherto happily unknown in the United States) is plain.   It is between what the jurors may say in deliberating upon their successive votes—what Wigmore calls "their subjective freedom of expression"—and overt acts, like getting drunk, or otherwise incapacitating themselves from discharge of their duty, or the effect on them of extraneous influences like evidential papers from a party or newspapers covertly brought into the jury room.

The decision of McDonald v. Pless (238 U. S. 264), relied upon in the majority opinion, was a civil cause, in which, despite the attempt to have a juror afterwards sworn upon defendant's motion for a new trial, a quotient verdict was sustained.

Professor Wigmore says (§ 2345): "The dogma that a juror may not impeach his verdict is, then, in itself neither correct in law nor reasonable in principle." He refers this doctrine of exclusion to the general principle of privileged communications between jurors during retirement. He lays down the fundamental principle: "The communications originate in a confidence of secrecy; this confidence is essential to the due attainment of the jury's constitutional purpose; the relation of juror is clearly entitled to the highest consideration and the most careful protection; and the injury from disclosure would certainly overbalance the benefits thereby gained." (§ 2346.) He also states that the communication of a juror's expressions of personal knowledge are within the privilege for confidential communications which "ought to exclude them." (§ 2354[2].)

However it may be in other jurisdictions, in the State of New York it is the privilege of the jurors that is inviolable, not the result in a mere verdict, the value of which depends wholly on maintaining such privilege. Suppose, after a jury have failed to agree and have been discharged, a juror should be sued for slander in having told his fellow jurors that the defendant in the case was a thief. Would such evidence be admissible, because it would not happen to "impeach a verdict?"

The power to punish for contempt in this state is limited. The Judiciary Law (Consol. Laws, chap. 30; Laws of 1909, chap. 35), section 753, subdivision 6 (re-enacted from Code Civ. Proc. § 14, subd. 6, and R. S. pt. 3, chap. 8, tit. 13, § 1, subd. 6; 2 R. S. 534, 535, § 1, subd. 6), provides: "A person duly notified to attend as a juror, at a term of the court, for improperly conversing with a party to an action or special proceeding, to be tried at that term, or with any other person, in

relation to the merits of that action or special proceeding; or for receiving a communication from any person, in relation to the merits of such an action or special proceeding, without immediately disclosing the same to the court."

The revisers spoke of defining a power to punish contempts, "which, while it is absolutely necessary in many cases, is yet perhaps, more liable to abuse, and in England, has been abused, more than any other possessed by the courts." Subdivision 6 was reported as enacted, except that the word "improperly" was inserted by the Legislature, who further struck out the revisers' additions, "for eating or drinking, after being sworn as jurors, or for departing from the court, or for separating from the other jurors or the officers having them in charge, without the permission of the court." (3 R. S. [2d ed.], 772, 773, Appendix.) To seek to punish for things privately said by jurors is not found in either section 750 or section 753 of the Judiciary Law. Where, after an acquittal, it was sought to call in question the act of a grand jury in finding the original indictment, Coke said of such attack on jurors: "It will be a cause of infinite vexation and occasion of perjury, and smothering of great offenses, if such averments and supposals shall be admitted after ordinary and judicial proceeding; and it will be a means, *ad deterrendos et detrahendos juratores a servitio Regis.*" (Floyd & Barker Case, 12 Coke, 23, 24.) Indeed the Federal court has fined a grand juror for such disclosure. (Matter of Atwell, 140 Fed. Rep. 368.) This was reversed because the obligation of secrecy was held not to continue after the grand jury had been finally discharged and the accused apprehended. (Atwell v. United States, 162 Fed. Rep. 97.)

The British Court of Chancery is declared to be "jealous of the personal freedom of the subjects of the Crown." (Hope v. Carnegie, L. R. 7 Eq. 254, 260.) Not less so should be the attitude of a New York court. "The power which courts possess of punishing for contempts, and for refusal to give evidence, is, in its nature, an exception to the provisions of

the Constitution. It is a power to deprive a man of his liberty, without a jury and without a regular trial. It cannot therefore be extended, in the least degree, beyond the limits which have been imposed by statute. No implication, and no fancied necessity, can be permitted to add to the literal meaning of the words by which the Legislature have restricted this power." (Rutherford v. Holmes, 5 Hun, 317, 319; affd. 66 N. Y. 368; approved in Johnson v. Austin, 76 App. Div. 312, 313.) "Any shred or remnant of undefined common-law power was deemed dangerous." (People ex rel. Munsell v. Court of Oyer & Terminer, 101 N. Y. 245, 250.)

Even in England, where there is no limiting statute, as in New York, for contempt, Sir George Jessel solemnly declared: "It seems to me that this jurisdiction of committing for contempt being practically arbitrary and unlimited should be most jealously and carefully watched, and exercised, if I may say so, with the greatest reluctance and the greatest anxiety on the part of judges to see whether there is no other mode, which is not open to the objection of arbitrariness and which can be brought to bear up on the subject." (Matter of Clements, 46 L. J. Ch. Div. [N. S.] 375, 383.)

The county prosecutor and the court should be ever zealous to preserve the purity, fairness and impartiality of juries, and to use all means provided by the Legislature to prevent interference with the due administration of justice. But the present order, with the method of inquiry followed, if allowed to stand as a precedent, in my judgment would work greater harm than could come from this acquittal. Such order removes landmarks which our ancestors set up. It strips from acts of a juror in an official body the protection to be regularly subjected to indictment and trial by the country, a safeguard guaranteed to the worst criminal. It does violence to a statute carefully framed to restrict criminal contempts to conduct willfully disobedient or disorderly.

Hence I vote to reverse, and to dismiss the proceedings.

KELLY, J. (dissenting):

I am obliged to dissent upon the ground that the proceedings against the relator were in violation of the Civil Rights Law (Consol. Laws, chap. 6; Laws of 1909, chap. 14), section 14. The juryman was called to account in a contempt proceeding for a verdict rendered by him.

Determination confirmed and appeal dismissed.