Stephen **CROWE**, et al., Plaintiffs,

v.

**COUNTY OF SAN DIEGO,**
et al., Defendants.

**Aaron Houser**, et al., Plaintiffs,

v.

**City of Escondido**, et al., Defendants.

**Michael Lee Treadway,**
**et al., Plaintiffs,**

v.

**City of Escondido, et al.,**

**Nos. CIV. 99–0241–R(RAB), CIV.**
**99–283–R, CIV. 99–253–R.**

United States District Court,
S.D. California.

June 25, 2002.

Milton J. Silverman, Jr., Law Offices of Milton Silverman, Robert J. Francavilla, Casey Gerry Reed and Schenk, Dennis A. Schoville, Schoville and Arnell, San Diego, CA, for plaintiffs.

Deborah Lynn Nash, County of San Diego Office of County Counsel, San Diego, CA, Diana L. Field, Ferguson Praet and Sherman, Santa Ana, CA, George W. Brewster, Jr., San Diego, CA, Kenneth H. Moreno, Murchison and Cumming, San Diego, CA, Mark A. Waggoner, City of Escondido, Office of the City Attorney, Escondido, CA, Richard J. Schneider, Daley and Heft, Solana Beach, CA, Luther W. Horton, Horton and Ryan, San Diego, CA, Hugh G. Radigan, Koester and Walker, Glendale, CA, for defendants.

## ORDER MAINTAINING SEALING OF TRANSCRIPTS

RHOADES, District Judge.

### I. Overview

On May 29, 2002, the Copley Press, Inc., Publisher of the San Diego Union–Tribune ("Copley Press"), filed a Renewed Motion for Access to Transcripts of Secret Court Proceedings and Sealed Records.[1] The transcripts memorialize the Court's eight in chambers meetings from November 1, 2000 through April 30, 2002 with representatives of the San Diego County Sheriff's Department and California Attorney General's Office involved in the criminal investigation of the murder of Stephanie Crowe.

The Court granted the Copley Press's Motion to Intervene on November 5, 2001, issued an Order Keeping Transcripts under Seal on December 3, 2001, and issued a concurrent Order under seal, for review by the Ninth Circuit, if necessary, summarizing the pertinent information obtained during the interviews with the Sheriff's Officers and Attorney General's representatives. Neither the Copley Press nor the parties appealed.

The circumstances surrounding the criminal investigation have changed since December 3, 2001—the Attorney General's Office charged Richard Tuite with the murder of Stephanie Crowe on May 15, 2002. Despite this change, the Court orders that the transcripts shall remain under seal.

### II. Background

As the parties are aware, the Court met periodically with Officers from the Sheriff's Department and representatives of the Attorney General's Office from No-

1. On June 5, 2002, KGTV Channel 10 joined the Copley Press's Request for Notice of any Motions to Close Hearings or Other Proceedings, or to Seal Records or Transcripts. The Ninth Circuit has stated: "[w]ithout adopting an inflexible rule, we believe that where a closure motion is not filed of record or made in open court, and when, as here, the court has been made aware of the desire of specific members of the public to be present, reasonable steps should be taken to afford such persons an opportunity to submit their views to the court before exclusion is accomplished." *United States v. Brooklier,* 685 F.2d 1162, 1168 (9th Cir.1982). The Court has been notifying the Copley Press, as an Intervenor, of all hearings in this matter. The Copley Press's standing as an Intervenor ends with the ruling in this Order. Henceforth, the Court declines to provide special notice to the Copley Press or KGTV Channel 10. The Court sees no reason why these media organizations, but not others, deserve special notice. Motions to close hearings or seal documents will be posted on the Court's docket, which serves as adequate notice for the press and public. Thus, the Court has satisfied *Brooklier's* "reasonable steps" instruction.

vember 1, 2000 through April 30, 2002.[2] The Attorney General's Office is currently handling the criminal case.[3] The purpose of the meetings—in a situation to which the Court has found no parallel—was to determine whether the Sheriff's Department and later the Attorney General's Office were proceeding with reasonable diligence in the criminal investigation in order to determine whether the stay of discovery in the civil case should be lifted. November 2, 2000 Order at 2.

On October 31, 2000, the Court faxed a letter to counsel for all parties, stating: "I assume, but wish to confirm, that the information received when I meet with the representatives of the Sheriff's office is not discoverable in the federal civil case. A copy of the transcript of the meeting will be placed in a sealed file for review, if necessary, by the Ninth Circuit. The meeting is set for November 1, 2000, at 10 a.m. If my assumption is in error, please advise prior to the meeting." None of the parties responded that the Court's assumption was in error. The Court read this statement into the record at its first meeting with the Sheriff's Officers.

The transcripts memorialize candid discussions between the Court and the Sheriff's Officers and Attorney General's representatives covering intimate details of the investigation and potential prosecution, including: leads and dead ends in the criminal investigation; speculation by the detectives regarding the evidence; questions and inquiries regarding physical evidence; experts' opinions; statements obtained from Richard Tuite—the man charged in the criminal case, including *Miranda* rights; Tuite's psychological profile and background; prospective investigative and prosecutorial strategy and tactics; "similar act" incidents involving Tuite; and informants' and other witnesses' identities and statements. The discussions also touched on the Sheriff's Officers' interaction with the San Diego County District Attorney's Office until July 2001 when the Attorney General's Office accepted prosecutorial responsibility.

On May 15, 2002, the Attorney General's Office charged Richard Tuite with the January 20, 1998 murder of Stephanie Crowe. *People of the State of California v. Richard Raymond Tuite*, San Diego Superior Court, Case No. CD166932. Tuite was arraigned on the murder charge on May 16, 2002. The criminal proceeding is currently pending a preliminary hearing in the San Diego Superior Court.

On May 29, 2002, the Copley Press filed a Renewed Motion for Access to Transcripts of Secret Court Proceedings and Sealed Records. None of the parties to the civil case oppose unsealing the transcripts. The Court permitted the Attorney General's Office to review the transcripts. The Attorney General opposes unsealing the transcripts, contending: (1) the promise of secrecy which conditioned the in chambers meetings should be respected against the press's alleged right of access; and (2) Tuite's right to a fair trial could be compromised if the transcripts were unsealed. Moreover, the Attorney General points out

---

2. The meetings occurred on November 1, 2000, February 1, 2001, May 8, 2001, June 20, 2001, June 28, 2001, August 29, 2001, December 12, 2001, March 14, 2002 and April 30, 2002. Representatives from the Attorney General's Office began attending the meetings on August 29, 2001.

3. The Escondido Police Department asked the San Diego County Sheriff's Department to assume investigative responsibility for the Stephanie Crowe murder investigation in January 2000. The Sheriff's Department began receiving all evidence related to the Crowe investigation from the Escondido Police in March 2000. The California Attorney General's Office accepted prosecutorial responsibility from the San Diego District Attorney's Office in July 2001.

that at least some of the matters discussed at the meetings will not be part of the standard discovery in the Tuite criminal case,[4] and that some of the matters will not be offered into evidence in the Tuite criminal case because they are irrelevant or incompetent or will be subject to litigation regarding their admissibility in the criminal proceedings.

The Court also notes that Tuite is not a party to the civil action, and thus is unable to formally assert his right to a fair in the civil proceedings.[5]

## III. Discussion

### A. The Court has "standing" to protect Tuite's Sixth Amendment right to a fair trial.

The Copley Press contends that the Court must address issues of standing and that the Court "stands in the shoes of the public in ensuring that public access is not denied absent strict compliance with the First Amendment compelling interest test." Copley Press's Renewed Mot. at 4. The Court fully agrees. As discussed below, the Court has strictly complied with the First Amendment compelling interest test.

The Copley Press continues by quoting the Sixth Circuit:

It is the individual defendant to whom the Sixth Amendment guarantees a fair trial. (Fn.Omitted.) *See Levine v. United States Dist. Ct.*, 764 F.2d 590, 596 (9th Cir.1985), *cert. denied*, [476 U.S. 1158], 106 S.Ct. 2276, 90 L.Ed.2d 719 (1986). It is the public to whom the First Amendment guarantees reasonable access to criminal proceedings.

[*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980).] And it is individuals, not the government, to whom First Amendment interests attach.

Copley Press's Renewed Mot. at 5 (quoting *United States v. Ford*, 830 F.2d 596, 600 (6th Cir.1987)). The omitted footnote reads:

The government has a more limited interest, supported by the common law and by Article II's prescription that the executive 'take care that the laws be faithfully executed' to see that a prosecution produces a just result. *See Singer v. United States*, 380 U.S. 24, 36, 85 S.Ct. 783, 790, 13 L.Ed.2d 630 (1965) ('[T]he government, as a litigant, has a legitimate interest in seeing that cases in which it believes a conviction is warranted are tried before [a jury] which the Constitution regards as most likely to produce a fair result.'); ABA Standards for Criminal Justice 3–1.1(c) (2d ed. 1980) ('The duty of the prosecution is to seek justice, not merely to convict.').

Thus, the government has an interest, though "more limited," to ensure that the criminal prosecution "produces a just result."

It is important to note that the criminal defendant, whose Sixth Amendment right to a fair trial would be impaired by unsealing the transcripts, is not a party to the civil action, and thus cannot formally assert his rights before the Court. Therefore, the Attorney General asserted Tuite's right to a fair trial.[6] Att'y Gen.'s Resp. at 8–10.

---

4. The Attorney General will make discovery to the defense in the *Tuite* case as required by California Penal Code § 1054 et seq., *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and any other orders of the Superior Court. Att'y Gen.'s Resp. at 3.

5. The Court has been notifying Tuite's attorney of the hearings in the civil case since his arraignment.

6. The Court recognizes that the Attorney General is not a party to the civil action either; however, representatives of the Attorney Gen-

█ The Court is also responsible for protecting Tuite's fair trial rights. "The courts retain an obligation, independent of that owed by the United States Attorney, to preserve the secrecy of grand jury proceedings and the privacy of jurors." *In re Petition of the Tribune Co.*, 784 F.2d 1518, 1522 (11th Cir.1986). Similarly, here, the Court retains an obligation, independent of the Attorney General's obligation, to preserve the secrecy of the information in the transcripts in order to protect Tuite's fair trial rights. Although the jurors were not parties to *In re Petition of the Tribune Co.*, the Eleventh Circuit protected their interests. Here, although Tuite is not a party to the civil case, the Court, along with the Attorney General prosecuting the criminal case, must protect his interests.

The Copley Press contends that the public's First Amendment right of access "trumps any government interest that could be asserted with respect to the underlying criminal trial (*except, in appropriate circumstances, the defendant's right to a fair trial*)." Copley Press's Renewed Mot. at 5 (emphasis added). This case is the "appropriate circumstance"—the public's right of access is qualified and is overcome by the compelling interest of Tuite's Sixth Amendment right to a fair trial, and the compelling interest of protecting the integrity of the criminal investigation and prosecution. As the United States Supreme Court has stated: "[t]he authors of the Bill of Rights did not undertake to assign priorities as between the First Amendment and Sixth Amendment rights, ranking one superior to the other." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 561, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).

**B. Despite a constitutional right of access to criminal trials, and a common law right to inspect and copy judicial documents and records, there is no right of access to the transcripts.**

█ The Court recognizes the press's and general public's constitutional right of access to criminal trials, as well as a common law right to inspect and copy public records and documents, including judicial documents and records. *Phoenix Newspapers, Inc. v. United States Dist. Ct.*, 156 F.3d 940, 946 (9th Cir.1998) (quoting *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978)). However, "there is no right of access which attaches to all judicial proceedings, even all criminal proceedings." *Id.*

**1. The transcripts do not fulfill the Supreme Court's "experience and logic" test.**

Although the Court begins with a presumed right of access to court proceedings and documents, the Court must apply the Supreme Court's "experience and logic" test to determine whether a right of access attaches to a particular kind of hearing. *Phoenix Newspapers*, 156 F.3d at 946 (citing *Oregonian Publ'g Co. v. United States Dist. Ct.*, 920 F.2d 1462, 1465 (9th Cir. 1990)).

█ The "experience" factor of the test examines " 'whether the place and process have historically been open to the press and general public.' " *Phoenix Newspapers*, 156 F.3d at 946 (quoting *Press–Enterprise Co. v. Super. Ct.*, 478 U.S. 1, 8, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (*"Press–Enterprise II"*)). The "logic" factor ex-

eral's Office attended the in chambers meetings and the Attorney General is prosecuting the criminal case against Tuite.

amines "'whether public access plays a significant positive role in the functioning of the particular process in question.'" *Id.* A qualified First Amendment right of access arises only if a proceeding satisfies both factors. *Id.*

### a. Experience factor

Applying the experience factor to the present case, the Court finds no "historical tradition of public access" to criminal investigations. *See The Times Mirror Co. v. United States,* 873 F.2d 1210, 1213–14 (9th Cir.1989). The circumstances of the present case are unique. The Court met with the Sheriff's Officers and Attorney General's representatives to monitor a criminal investigation to determine whether the stay of discovery in the present civil case, ordered on November 2, 2000, should be lifted.[7] To make this determination, the Court needed to decide whether the investigation was being conducted with reasonable diligence. This is not the Court's customary role. The Court gained sensitive, intimate knowledge of the Sheriff's Officers' criminal investigation, which is memorialized in the transcripts.

In its December 3, 2001 Order, the Court pointed out that although the transcripts are unusual, they are analogous to the materials in *Times Mirror,* where the Ninth Circuit found no First Amendment right of access to search warrant proceedings and materials when a preindictment criminal investigation was ongoing. 873

F.2d at 1210, 1218; December 3, 2001 Order at 6. The *Times Mirror* court found that the government has always been able to restrict access to preindictment warrant materials by requesting a sealing order, which courts have granted freely upon a showing that a criminal investigation requires secrecy. *Id.* at 1214. The Court acknowledges the *Times Mirror* court's focus on the preindictment nature of the materials, and the distinction that the Tuite criminal case is currently in a postindictment phase. The *Times Mirror* court noted: "We need not and do not decide at this time the question whether the public has a First Amendment right of access to warrant materials after an investigation is concluded or after indictments have been returned." *Id.* at 1211. *Times Mirror's* preindictment focus does not preclude a finding that postindictment materials should remain under seal. The criminal investigation in the Tuite case is still ongoing. Att'y Gen.'s Resp. at 6 n.1. The *Times Mirror* court's rationale, though applied in that case to a preindictment situation, applies to the unique circumstances of the present civil case and related criminal investigation and prosecution.

[T]he investigation of criminal activity has long involved imparting sensitive information to judicial officers who have respected the confidentialities involved. The process of disclosing information to a neutral magistrate to obtain a search

---

7. The November 2, 2000 Order stayed all discovery in the federal civil case. The Order referred the parties to the Court's October 31, 2000 faxed letter requesting confirmation that the information revealed during the November 1, 2000 meeting with the Sheriff's Officers was not discoverable in the civil case, and notes that all parties agreed to keeping the contents of the meeting with the Sheriff's Officers under seal. Moreover, the Order details the Court's determination that rather than limit the Court's inquiry to the general question of whether an active, ongoing inves-

tigation existed, the Court needed to ask the Officers specific questions as to the facts they were investigating, why they were investigating them and how they were conducting the investigations. The Court noted that after meeting with the Officers, it was convinced that the Sheriff's Department was making every effort to solve the crime and had every intent to do so as soon as possible, and thus ordered the stay of discovery, which was renewed after each meeting with the Sheriff's Officers and Attorney General's representatives.

warrant, therefore, has always been considered an extension of the criminal investigation itself. It follows that information disclosed to the magistrate in support of the warrant request is entitled to the *same confidentiality accorded other aspects of the criminal investigation.* Both the magistrate in granting the original sealing order and the district court in reviewing such orders have necessarily been highly deferential to the government's determination that a given investigation requires secrecy and that warrant materials be kept under seal.

*Times Mirror,* 873 F.2d at 1214 (internal quotation marks and citations omitted) (emphasis added).

The Court has determined that the Tuite criminal investigation requires secrecy. For similar reasons, grand jury proceedings, jury deliberations, and internal court communications, for example, have not historically been open to the public because the integrity and independence of such proceedings, as in a criminal investigation, would be threatened by public disclosures. *See id.* at 1213.

No party (including the Intervenor, the Copley Press) has suggested, nor has the Court's research uncovered, any adequate historical basis to support the proposition that the press and public have a right of access to the transcripts.

### b. Logic factor

Applying the logic factor to the present case, the Court looks to whether public access would play a significant positive role in the functioning of the criminal investigation. Although the Court acknowledges that public scrutiny allows the public to serve as a check on possible governmental abuses and enhances the quality and integrity of the fact-finding process, these interests can be outweighed by "the damage to the criminal investigatory process that could result from open warrant proceedings." *Times Mirror,* 873 F.2d at 1215.

The *Times Mirror* court found warrant proceedings indistinguishable from grand jury proceedings, which the Supreme Court has identified as "the classic example of the type of operation [ ] that would be totally frustrated if conducted openly ... [since] the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *Id.* (quoting *Press–Enterprise II,* 478 U.S. at 9, 106 S.Ct. 2735 (internal quotation marks and citation omitted)). As stated, the Court finds the *Times Mirror* rationale appropriate in the present case. Thus, the criminal investigation in the present case also falls into the "type of operation" that would be frustrated if conducted openly.

Moreover, the secrecy of grand jury proceedings is "maintained in large part to avoid jeopardizing the criminal investigation of which the grand jury is an integral part." *Id.* Likewise, here, the secrecy of the transcripts of the Court's meetings with the Sheriff's Officers and Attorney General's representatives is maintained to avoid jeopardizing the criminal investigation.

Unsealing the transcripts. could also compromise Tuite's Sixth Amendment right to a fair trial. "No right ranks higher than the right of the accused to a fair trial." *Press–Enterprise Co. v. Super. Ct.,* 464 U.S. 501, 508, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (*"Press–Enterprise I"*). The Supreme Court has "long recognized that adverse publicity can endanger the ability of a defendant to receive a fair trial.... To safeguard the due process rights of the accused, a trial judge has an affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity." *Gannett Co. v. DePasquale,* 443 U.S. 368,

378, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) (citations omitted).

Most cases in which the Supreme Court has found that press coverage deprived the defendant of a fair trial have been in small rural communities rather than large metropolitan areas like San Diego. *See Newspapers of New England, Inc. v. Clerk–Magistrate of the Ware Div. of the Dist. Ct. Dept.*, 403 Mass. 628, 633, 531 N.E.2d 1261 (1988) (citing *Columbia Broadcasting Sys., Inc. v. United States Dist. Ct.*, 729 F.2d 1174, 1181 (9th Cir.1943)). However, the enormous publicity and media coverage of the Stephanie Crowe case likens it to a case in a small community. The Court's librarian uncovered 397 printed articles on the topic between January 21, 1998 and June 4, 2002, as well as incalculable extensive television coverage.

None of the parties, nor the Copley Press, has sufficiently shown the Court how releasing the information obtained during the investigation and disclosed to the Court could play a positive role in the investigatory process or in providing a fair criminal trial for Tuite. Rather, the release would have the following immediate effect:

> It [would] create a news event, an opportunity for 'commentators' to speculate and to add to the volume of otherwise inadmissible material presented to potential jurors in this case.... [A criminal defendant] is entitled by the fundamental rules, which govern this society, to have a trial in this community before an impartial jury, which fairly resolves the issues of guilt and possible penalty based on evidence that has met the test of reliability in a court of law.

*Westerfield v. Super. Ct.*, 98 Cal.App.4th 145, 158, 119 Cal.Rptr.2d 588 (2002) (Huffman, Acting P.J., concurring and dissenting), *review filed* (May 7, 2002).

Importantly, the purpose of the Court's meetings with the Sheriff's Officers and the Attorney General's representatives was to enable the Court to determine procedural issues regarding lifting the stay of discovery in the civil case, rather than substantive issues in the criminal case. The Court's fact-finding functions were not implicated, and the Court was not determining the accused's guilt or innocence. *United States v. Norris*, 780 F.2d 1207, 1210 (5th Cir.1986). Thus, there was "no threat of judicial, prosecutorial or public abuse that a public trial is designed to protected against." *Id.* at 1210–11. Rather, the Court's goal was to ensure that the criminal investigation was proceeding with reasonable diligence, vis à vis a procedural aspect of the civil case (i.e., whether to lift the discovery stay). Any qualified right of access must be determined with this distinction in mind.

The Court finds no positive role for releasing the information recorded in the transcripts and no qualified right of access. Rather, the Court finds that unsealing the transcripts would harm the criminal investigation and prosecution and Tuite's right to a fair trial.

**C. Even if there were a qualified right of access, it would be overcome by the compelling interest of protecting the integrity of the criminal investigation and prosecution and Tuite's Sixth Amendment right to a fair trial.**

█ As discussed above, the Court finds that there is no qualified right of access to the transcripts, which contain sensitive information regarding the progress of a criminal investigation. However, even if there were a right of access, it is qualified, and can be overcome by a compelling interest. The Court applied the procedural and substantive requirements necessary to determine whether a compelling interest overcomes a qualified right of access, and

found that preserving the integrity of a criminal investigation and prosecution and protecting Tuite's Sixth Amendment right to a fair trial would overcome any qualified right of access to the transcripts. The Court's analysis follows.

### 1. Any potential right of access is not absolute, but qualified.

■ The right of the press to access court records stems from both the First Amendment and the common law. *See Press–Enterprise I*, 464 U.S. at 510 (First Amendment); *Nixon*, 435 U.S. at 598, 98 S.Ct. 1306 (common law). Under the First Amendment, the press and the public have a presumed right to access such documents. *Oregonian Publ'g*, 920 F.2d at 1465. On the other hand, at common law, the media must make a threshold showing, demonstrating a legitimate need for disclosure. *United States v. Kaczynski*, 154 F.3d 930, 931 (9th Cir.1998). Regardless of their source, however, both rights permit media access to criminal trials, as well as to pretrial, postindictment hearings transcripts, plea agreements and presentence reports. *See Press Enterprise II*, 478 U.S. at 10, 106 S.Ct. 2735 (pretrial, postindictment hearings transcripts); *Oregonian Publ'g*, 920 F.2d at 1466 (plea agreements); *CBS, Inc. v. United States Dist. Ct.*, 765 F.2d 823, 826 (9th Cir.1985) (presentence reports).

Notwithstanding the importance of the media's right to access court records, such a right—regardless of its source—is not absolute, but qualified. *See Phoenix Newspapers*, 156 F.3d at 949; *Oregonian Publ'g*, 920 F.2d at 1465. While both the common law and the First Amendment provide the media with the right to access court records, the First Amendment generally gives the media a more powerful basis for doing so. *See Kaczynski*, 154 F.3d at 932 (Reinhardt, J., concurring). As a result, "[g]enerally when courts decide issues involving the press's right to access they resolve them on First Amendment grounds rather than on the less protective common law basis." *Id.* at 932–33 (suggesting that "resolving the constitutional issues directly would ordinarily be the appropriate and sensible course for district courts to take"). Accordingly, the Court reviews the Copley Press's request for access using the more expansive First Amendment analysis.

■ Under a First Amendment analysis, the Court must comply with certain procedural and substantive requirements before ordering that the records in a particular case be sealed. *Oregonian Publ'g*, 920 F.2d at 1466. To satisfy scrutiny on procedural grounds, the Court must: (1) afford those denied access a reasonable opportunity to state their objections; and (2) articulate its reasons for denying access. *Id.* Thus, "[a]n order of closure should include a discussion of the interests at stake, the applicable constitutional principles, and the reasons for rejecting alternatives, if any, to closure." *Id.*

■ In addition to the procedural requirements, the First Amendment also requires the Court to comply with certain substantive requirements. Thus, before it may justifiably seal documents, the Court must find that: (1) the sealing serves a compelling interest; (2) there is a substantial probability that, in the absence of sealing, this compelling interest would be harmed; and (3) there are no alternatives to sealing that would adequately protect the compelling interest at issue. *Phoenix Newspapers*, 156 F.3d at 949 (quoting *Oregonian Publ'g*, 920 F.2d at 1466) (citing *Press Enterprise II*, 478 U.S. at 13–14, 106 S.Ct. 2735).

After considering these requirements, as discussed below, the Court orders the transcripts to remain under seal to protect the sensitive materials they memorialize.

The transcripts are available for review, if necessary, by the Ninth Circuit.

### 2. The Copley Press's need to access the transcripts.

The Copley Press adequately articulated its reasons for wanting access to the transcripts—the public's "need to monitor an elected, high-ranking public official, law enforcement, and the operation of the judicial system." [8]  Copley Press's Renewed Mot. at 1.

Regardless of the adequacy of the Copley Press's request, if the "experience and logic" test is fulfilled, the First Amendment presumes that the press and public have a qualified right to access such documents. *Oregonian Publ'g*, 920 F.2d at 1465. Thus, although the Court finds no right of access, as described above, it will analyze the Copley Press's Renewed Motion as if there were a qualified right of access.

### 3. The Court satisfied the procedural requirements of the First Amendment.

The Court considers whether its actions satisfy the procedural requirements of the First Amendment. As stated, before sealing records related to a criminal proceeding, the First Amendment requires that the Court: (1) afford those denied access a reasonable opportunity to state their objections; and (2) articulate its reasons for withholding access. *Oregonian Publ'g*, 920 F.2d at 1466.

After considering these factors, the Court believes that its actions have complied with the requirements of the First Amendment. The Court's November 2, 2000 Order referred the parties to the Court's October 31, 2000 faxed letter, which requested (and secured) confirmation that the information revealed during the November 1, 2000 meeting with the Sheriff's Officers was not discoverable in the civil case. The Court also gave the press the opportunity to intervene, file briefs, and present oral argument at the December 3, 2001 hearing. After the Copley Press filed its Renewed Motion on May 29, 2002, the Court again gave the parties and the press the opportunity to file briefs and present oral argument at the June 24, 2002 hearing. Thus, the Court provided both the parties and the press a reasonable opportunity to comment on the propriety of sealing the records.

Further, the Court believes that the present written Order, the sealed transcripts available for review by the Ninth Circuit, if necessary, and the November 2, 2000 Order adequately detail the Court's reasons for withholding the transcripts from public view. Thus, the Court has complied with the procedural requirements of the First Amendment.

### 4. The Court satisfied the substantive requirements of the First Amendment.

Next, the Court considers whether sealing the transcripts satisfies the First Amendment's substantive requirements. The Court must find that: (1) sealing the records serves a compelling interest; (2) there is a substantial probability that, in the absence of sealing, this compelling in-

**8.** The Court notes that aside from this initial contention, the Copley Press focuses solely on monitoring the pending election of San Diego District Attorney Paul Pfingst, who was prosecuting the criminal case until the California Attorney General's Office assumed responsibility. Copley Press's Renewed Mot. at 2–3. As the Attorney General points out, the Copley Press's interest in unsealing the transcripts appears to be focused on District Attorney Pfingst's handling of the Stephanie Crowe criminal investigation and potential prosecution, not the present civil case or current and future criminal prosecution of Tuite. Att'y Gen.'s Resp. at 5–6.

terest would be harmed; and (3) there are no alternatives to sealing that would adequately protect the compelling interest at issue. *Phoenix Newspapers,* 156 F.3d at 949. The Court considers each requirement in turn.

### a. Closure serves the compelling interests of protecting the continuing criminal investigation and prosecution and protecting Tuite's Sixth Amendment right to a fair trial.

The Court finds that sealing the transcripts serves the compelling interests of preserving the integrity of the continuing criminal investigation and prosecution and protecting Tuite's Sixth Amendment right to a fair trial.

The Second Circuit found that sealing a portion of a plea agreement concerning grand jury proceedings "was essential to protect the secrecy of sensitive matters affecting a grand jury proceeding and an *ongoing criminal investigation,* and that such closure was narrowly tailored to serve those interests." *United States v. Haller,* 837 F.2d 84, 87 (2d Cir.1988) (emphasis added). Moreover, "the sensitivity of an ongoing criminal investigation [was a] 'higher value[ ]' justifying sealing." *Id.* at 88 (citing *Press–Enterprise II,* 478 U.S. at 13–14, 106 S.Ct. 2735).

The Ninth Circuit also recognized the importance of guarding the secrecy of criminal investigations. While acknowledging the benefits of public scrutiny of judicial proceedings, the Ninth Circuit pointed out, however, that "complete openness would undermine important values that are served by keeping some proceedings closed to the public. Openness may,

for example, *frustrate criminal investigations* and thereby jeopardize the integrity of the search for truth that is so critical to the fair administration of justice." *Times Mirror,* 873 F.2d at 1213 (emphasis added).[9]

The Court also finds that protecting Tuite's right to a fair trial is a compelling interest. The Court notes again that "[n]o right ranks higher than the right of the accused to a fair trial," *Press–Enterprise I,* 464 U.S. at 508, 104 S.Ct. 819, and the Court's duty to safeguard the due process rights of the accused. *Gannett,* 443 U.S. at 378, 99 S.Ct. 2898.

The Court concludes that protecting the integrity of the criminal investigation and prosecution and protecting Tuite's Sixth Amendment right to a fair trial provide compelling reasons for sealing the transcripts.

### b. There is a substantial probability that, in the absence of sealing, the criminal investigation and prosecution and Tuite's right to a fair trial would be jeopardized.

The Court finds that there is a substantial probability that, in the absence of sealing, the criminal investigation and prosecution and Tuite's right to a fair trial would be jeopardized. Some of the information discussed in the in chambers meetings will not be part of the discovery in the Tuite case; some of the material is irrelevant, incompetent, or its admissibility will be challenged. Att'y Gen.'s Resp. at 3, 9; *see, e.g., Corces,* 1997 WL 447979, at *2; *Westerfield,* 98 Cal.App.4th at 151, 119 Cal. Rptr.2d 588.

Confidential and privileged law enforcement processes would be compromised if the transcripts were unsealed. Att'y Gen.'s Resp. at 6.

---

**9.** Additionally, the government has a "compelling interest in preserving the secrecy of law enforcement techniques." *United States v. Corces,* 1997 WL 447979, at *9 (M.D.Fla. 1997), *aff'd,* 152 F.3d 934 (11th Cir.1998).

**c. There are no alternatives to sealing the transcripts that would adequately protect the criminal investigation and prosecution and Tuite's Sixth Amendment right to a fair trial.**

Finally, the Court considers whether there are any alternatives to sealing that would adequately protect the criminal investigation and prosecution and Tuite's fair trial rights. In considering this factor, the Court recognizes that it must use "narrowly tailored" measures. *Oregonian Publ'g,* 920 F.2d at 1465.

The Court has reviewed the transcripts in detail, and has determined that dissecting the transcripts to parse out individual facts for publication is impossible. Benign information is inextricably intertwined with objectionable information. *See, e.g., Corces,* 1997 WL 447979, at *9. There is a substantial probability that revealing any of the facts recorded in the transcripts would jeopardize the continuing criminal investigation and prosecution and violate Tuite's Sixth Amendment right to a fair trial.

Moreover, many potential alternatives to sealing that would usually be available to the Court (e.g., a change of venue, a gag order on the trial attorneys, special jury instructions and careful voir-dire) are available only to the San Diego Superior Court responsible for the state criminal case, not to the Court in the federal civil case.

## IV. Conclusion

The Court shall keep the transcripts under seal. However, the Court recognizes that the documents "must be released when the danger of prejudice has passed." *Phoenix Newspapers,* 156 F.3d at 947–48. Accordingly, the Court is willing to reconsider the appropriateness of continued sealing at a future date should the present circumstances change.

This Order shall in no way affect the rights of the parties and the press to move to seal or unseal investigative materials in the state criminal action. Decisions regarding sealing in the state court action are to be decided solely by the San Diego Superior Court.

**IT IS SO ORDERED.**