[Nos. 38034-0-II; 38104-4-II.   Division Two.   May 18, 2010.]

THE STATE OF WASHINGTON, *Respondent*, v. MICHAEL LYNN SUBLETT, *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. CHRISTOPHER LEE OLSEN, *Appellant*.

162

164

*Jeffrey E. Ellis* (of *Ellis Holmes & Witchley PLLC*); and *Manek R. Mistry* and *Jodi R. Backlund* (of *Backlund & Mistry*), for appellants.

*Edward G. Holm, Prosecuting Attorney,* and *Carol L. La Verne, Deputy,* for respondent.

¶1 QUINN-BRINTNALL, J. — A jury entered verdicts finding codefendants Michael Sublett and Christopher Olsen guilty of first degree murder. Sublett and Olsen appeal, asserting that the trial court violated their public trial rights and their right to be present by holding an in-chambers conference to address a question submitted by the jury during its deliberations and that the trial court violated their due process rights by refusing to answer the jury's question.

¶2 Additionally, Sublett contends that the trial court erred by refusing to sever the codefendants' trial and in calculating his offender score. Sublett also contends that the prosecutor committed misconduct in closing argument by misstating the probative value of the deoxyribonucleic acid (DNA) evidence and by showing a photograph of the defendants with the word "guilty" superimposed over their faces. Last, Sublett asserts in his statement of additional

grounds (SAG)[1] that the State committed a *Brady*[2] violation by suppressing exculpatory evidence and he raises a number of issues we cannot address in his direct appeal on the record provided.

¶3 Olsen also contends that (1) the trial court's felony murder instruction violated his due process rights, (2) his counsel was ineffective for proposing a nonstandard lesser included second degree manslaughter instruction, (3) his counsel was ineffective for not proposing the standard first and second degree manslaughter instructions, (4) the trial court erred by denying his motion for a new trial, (5) the trial court erred by admitting evidence of prior bad acts under ER 404(b), and (6) the trial court violated his due process right to present a defense by excluding relevant admissible evidence. Finding no merit in any of the appellants' contentions, we affirm.

## FACTS

BACKGROUND FACTS

¶4 In 2005, April Frazier met Jerry Totten at an Alcoholics Anonymous meeting. Totten befriended Frazier and allowed her to stay in a trailer on his property in Tumwater, Washington. He gave Frazier the only key to the trailer; Totten also gave Frazier a key to his house. Totten allowed Frazier's boyfriend, Sublett, to visit freely with Frazier in the trailer and in his house.

¶5 In November 2006, Frazier stole coins from Totten and had a friend pawn them for $200. On January 10, 2007, Sublett pawned more of Totten's coins for $115. On January 16, 2007, Sublett pawned Totten's generator for $150. On January 27, 2007, Sublett pawned a second generator belonging to Totten for $234.

¶6 Frazier and Sublett traveled together to Reno, Nevada. In late January 2007, while the couple were in Reno,

---

[1] RAP 10.10.

[2] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

Frazier's friend, Olsen, called her from the Thurston County jail. Frazier told Olsen that she would bail him out of jail. Frazier called Totten from Reno and convinced him to wire her $500 for nonexistent car repairs. When Frazier and Sublett returned to Washington at the end of January 2007, they visited Totten and stole his wallet, cell phone, and checkbook. On January 29, 2007, Frazier and Sublett bailed Olsen out of jail using $1,000 they had stolen from Totten. Olsen's mother signed the bond.

¶7 After Frazier and Sublett bailed Olsen out of jail, the group went to the Little Creek Casino Hotel in Shelton, Washington, and used methamphetamine. Later that same day or the next day, all three went to Totten's home.

¶8 On January 30, 2007, Matthew Gantenbein saw a pickup truck over an embankment of Old Olympic Highway in Thurston County. Gantenbein approached the truck and saw that the driver's side door was open, the truck was in neutral, and the engine was running. He did not see anybody in or near the truck. When Gantenbein looked under the canopy in the truck's bed, he saw "a bunch of boxes" and "stuffed animals." 2 Report of Proceedings (RP) at 72. The Washington State Patrol arrived and impounded the truck.

¶9 On February 4, 2007, Tumwater Police Detective Charles Liska responded to a domestic violence incident at a Tumwater hotel room where Frazier and Sublett were staying; Frazier was alone in the room when Liska arrived. Frazier told Liska that Sublett had physically assaulted her over the last few days. Frazier allowed Liska to photograph her injuries but she was otherwise uncooperative and declined medical attention. Liska observed methamphetamine and a butane torch in the motel room but he did not make an arrest.

¶10 That same day, Sublett called his friend, Elsie Pray. Sublett told Pray that he and Frazier had gotten into a fight and that he wanted Pray to speak with her. Later that evening, Frazier told Pray that she and two other people had killed Totten on January 29, 2007. According to Pray, Frazier said that she knocked on Totten's door and, when he

answered the door, the two others pushed him into a recliner, beat him with a baseball bat, and shot him with her gun. Frazier told Pray that she was in another room of the house listening to music while the two others killed Totten. Frazier told Pray that the group had wrapped up Totten's body, placed it in one of his trucks, and then rolled the truck down an embankment near Mud Bay in Thurston County. Frazier showed Totten's checkbook and driver's license to Pray. On February 10, 2007, Pray contacted the police and reported this conversation.

¶11 On February 5, 2007, Frazier and Sublett asked Peter Landstad to loan them his vehicle so they could move into a new residence. Landstad agreed to loan them his vehicle and the couple left Sublett's car with Landstad. Frazier and Sublett did not return Landstad's car on the agreed date and instead called him and offered to buy the vehicle for $2,500. Landstad spoke with Sublett three times about Sublett wiring the money owed to him, but Sublett did not send him any money.

¶12 On February 8, 2007, Totten's sister, Shirley Inman, contacted the Tumwater Police Department to request that they perform a welfare check on Totten. Inman was concerned because she had not been able to contact her brother since January 15, 2007, when he had left after visiting Oregon for their mother's 90th birthday. Tumwater Police Officer Tim Eikum went to Totten's house and entered through an open door; Eikum noticed that the house was in disarray, but he did not see any obvious signs that a crime had been committed.

¶13 On February 10, 2007, Inman and her mother went to Totten's house to check on him. When they could not find Totten, they called the Tumwater Police Department. Officer Eikum went to Totten's house and saw that nothing had changed since his February 8, 2007 welfare check. Eikum checked to see if Totten had any vehicles registered in his name. Later that evening, Eikum discovered that the Sheriff's Department had impounded Totten's 1989 Ford pickup truck. After receiving a search warrant, Thurston

County Sheriff's Deputy Michael Stewart searched the back of the pickup truck and, after removing a number of blankets, saw Totten's body "gagged across the mouth and across the top of the head . . . laying [sic] on a picnic table." 2 RP at 63.

¶14 On February 14, 2007, police arrested Frazier and Sublett in Las Vegas, Nevada. In the couple's Suburban, police found Totten's disabled parking placard, a loaded gun, and various items belonging to Totten, including his wallet, checkbook, and Social Security card. On February 22, 2007, Olympia police officers arrested Olsen. When officers confronted Olsen, he gave them a false name, but later he admitted his identity.

¶15 Olsen gave law enforcement two statements that were later admitted into evidence at trial. In his statements, Olsen admitted that he had been inside Totten's house and that he had planned to help Frazier and Sublett steal from him, but he denied participating in Totten's murder. Olsen stated that Totten was already dead or fatally injured when he arrived at the house. Olsen also admitted to stealing items from Totten's home and to helping move Totten's body.

PROCEDURAL FACTS

¶16 The State charged Sublett and Olsen with premeditated first degree murder and, in the alternative, first degree felony murder. In exchange for her testimony against Sublett and Olsen, the State allowed Frazier to plead guilty to second degree manslaughter, first degree burglary, and rendering criminal assistance, and it agreed to recommend a 54-month prison sentence.

¶17 On January 7, 2008, the State filed a CrR 4.3(b) motion to join the defendants for trial. Sublett opposed the State's motion to join, asserting that the defendants had antagonistic defenses. On May 8, 2008, the trial court consolidated the cases for trial.

¶18 A jury trial began on June 2, 2008. At trial, forensic scientist Karen Green testified that she had obtained a

partial DNA profile from the handle of a wooden bat found at the crime scene. Green further testified that, based on the partial DNA sample, she could not rule out Sublett and Totten as possible contributors and that one in every 130 individuals in the United States population could be a possible contributor. She also testified that a DNA sample taken from a latex glove found at the scene matched Olsen's profile and that "the estimated probability of selecting an unrelated individual at random from the U.S. population with a matching profile to that glove is one in six quadrillion." 4 RP at 338. The State also presented evidence that, in the days following Totten's death, Frazier and Sublett made several purchases using Totten's credit cards.

¶19 At trial, Frazier testified that she and Sublett had bailed Olsen out of jail so that he could help them rob Totten. Frazier stated that after the group had ingested methamphetamine at a hotel, Sublett drove the three of them to Totten's home. She stated that after Totten let her into his house, she let Sublett and Olsen in through a back door. She further stated that she saw Olsen grab an aluminum bat from the utility room on his way into the house. Frazier claimed that she stayed in the laundry room while the two men beat Totten and that, after she heard Totten moan loudly, she turned up the music on her cell phone so she could not hear anything else. She testified that Sublett then came into the utility room and took an extension cord.

¶20 Frazier further testified that Sublett had told her to get blankets and that she had seen Totten's dead body as she walked through the living room. Frazier stated that Olsen was upset after the killing and that Sublett took Olsen for a drive to calm him down, leaving her alone at the house for an hour. Frazier testified that while she was alone, she collected valuables and stored them in a spare bedroom. Frazier also testified that she and Sublett took bags of stolen items from the house, including credit cards, a laptop computer, and documents from Totten's desk. She stated that the three of them returned the next day to

dispose of Totten's body. She testified that after they loaded Totten's body into the back of one of his trucks, she stayed at the house while Olsen drove the truck away with Sublett following him in another car. Frazier stated that after the men returned from moving Totten's body, Olsen remarked that he had enjoyed what he had done and would do it again.

¶21 On cross-examination, Frazier admitted that during her interviews with the police, she had not mentioned Olsen's remarks regarding enjoying what he had done to Totten. She also testified that sometime after Olsen made this statement, he sat under a kitchen table with his knees drawn up and was crying. She further testified on cross-examination that Sublett had pointed his gun at Olsen in Totten's house and later in the motel room. Frazier also admitted on cross-examination that she had told several lies in the days surrounding Totten's death, including that Totten was a child molester with a jar of his victims' teeth, that she needed to borrow her friend's Suburban because she and Sublett were moving to a new residence, that she needed money to repair a broken car, and that she knew Sublett had not killed Totten.

¶22 The State sought to introduce tape recordings of two phone calls Olsen made to Frazier while Olsen was in jail on an unrelated charge. Olsen objected to the evidence, asserting that it was cumulative because Frazier had already testified as to the nature of her phone conversations with him; Olsen also objected because he claimed that portions of the calls contained offensive terms and evidence of prior bad acts in violation of ER 404(b). The trial court allowed the State to play the entire audio recordings of the phone calls over Olsen's objections.

¶23 Olsen's defense counsel sought to elicit testimony from Totten's neighbor, an attorney named Todd Rayan. Rayan's proffered testimony was that Totten had asked him about obtaining a restraining order against Frazier and that Totten had stated to him that Frazier had overstayed her welcome and that he had asked her to leave. The State

objected to Rayan's proffered testimony, asserting that it was inadmissible hearsay. The trial court sustained the State's objection in part; it allowed Rayan to testify that Totten sought his advice on obtaining a restraining order but it did not allow him to testify as to whom Totten sought the restraining order against or that Totten suspected Frazier had been stealing from him. The trial court also allowed Rayan to testify that he had heard Totten and Sublett arguing in Totten's carport approximately two weeks before police came to the property to investigate Totten's disappearance.

¶24 Olsen testified in his defense. He stated that when he spoke to Frazier while he was in jail, he was willing to say anything to have her bail him out, but he denied making an agreement to rob or hurt anyone. Olsen admitted that he went to Totten's house but stated that he was unsure whether Totten was already dead when he arrived. Olsen also admitted that he helped to move Totten's body. Olsen further testified that he did not receive any money or property for his participation in the incident. Olsen also testified that after the group moved Totten's body, Sublett forced him to cooperate by threatening him with a gun and by threatening to hurt his family.

¶25 At closing, the prosecutor made the following argument:

> That bat was wiped for DNA. Mr. Sublett was not excluded as a DNA contributor, and the probability that he was the contributor to that DNA found on that bat was one in 130. Now, you know, you take that number, one in 130, and consider it in a vacuum, that's a low number, especially when you consider what was the -- Mr. Olsen's DNA was one in six I don't know how many gazillions; a lot. So in light of that, one out of 130, that's a low number, but when you consider that evidence, ladies and gentlemen, one in 130, when you consider that evidence in light of all of the evidence in the case, that was Mr. Sublett's DNA because Mr. Sublett was at that house. Mr. Sublett was at that house on January 29th. He was the guy that stole the credit cards. He was the guy that had the credit cards stolen from Jerry Totten. His fingerprints were in the

utility room. April Frazier put him there and Christopher Olsen. So ladies and gentlemen, I submit the totality of the evidence, Sublett had that bat.

9 RP at 997. Later, in closing, the prosecutor remarked, "Turns out that Mr. Sublett's DNA is on a wooden bat." 9 RP at 1074.

¶26 Defense counsel objected to the prosecutor's use of an image during its closing argument that apparently depicted the defendants with the word "guilty" superimposed over their photos. The trial court sustained the objection and had the State remove the image.

¶27 Olsen's defense counsel proposed the following lesser included second degree manslaughter instruction:

> To convict the defendant of the crime of manslaughter in the second degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about the 19th day of January, 2007, the defendant failed to summon aid after illegally entering Jerry Totten's residence;
>
> (2) That the defendant's conduct was criminal negligence;
>
> (3) That Jerry Totten died as a result of the defendant's acts; and
>
> (4) That the acts occurred in the State of Washington.
>
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
>
> On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

Clerk's Papers (CP) (Olsen) at 40.

¶28 The trial court refused to give this proposed instruction but the record does not include the reasons for the trial court's refusal. Defense counsel did not propose any other lesser included jury instructions and the trial court did not provide any to the jury.

¶29 The trial court gave the following accomplice liability jury instruction (Instruction 21):

A person is guilty of a crime if it is committed by the conduct of another person for which he or she is legally accountable. A person is legally accountable for the conduct of another person when he or she is an accomplice of such other person in the commission of the crime.

A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:

(1) solicits, commands, encourages, or requests another person to commit the crime; or

(2) aids or agrees to aid another person in planning or committing the crime.

The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.

A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.

CP (Sublett) at 156; CP (Olsen) at 71.

¶30 During its deliberations, the jury submitted the following question to the court:

Clarification of Instruction 21. The structuring of the 2nd sentence in the 1st paragraph is unclear. Which of the following is correct for intent? A person (X) is legally accountable for the conduct of another person (Y) when he or she (X) is an accomplice of such other person (Y) in the commission of the crime. - OR - A person (X) is legally accountable for the conduct of another person (Y) when he or she (Y) is an accomplice of such other person (X) in the commission of the crime.

CP (Sublett) at 129.

¶31 Counsel met with the trial court in chambers to address the jury's question. Counsel agreed to the trial court's answer to the jury question, which stated, "I cannot answer your question please re-read your instructions." CP

(Sublett) at 129. The jury found Sublett guilty of first degree murder by premeditation and in the course of a felony, and it found Olsen guilty of first degree murder in the course of a felony but not by premeditation.

¶32 Olsen moved for a new trial, asserting that he had discovered new evidence of a witness that he could have used to impeach Frazier's testimony. The State opposed the motion for a new trial, arguing that the newly discovered evidence was merely cumulative or impeaching. The trial court denied Olsen's motion for a new trial.

¶33 At sentencing, the State sought a life sentence for Sublett under the Persistent Offenders Accountability Act (POAA), RCW 9.94A.555, based on his prior California robbery convictions. The trial court found that Sublett's prior out-of-state convictions were comparable to Washington strike offenses under the POAA and sentenced him to life in prison without the possibility of parole. The trial court sentenced Olsen to a standard range sentence, 500 months of incarceration, based on his offender score of nine. Sublett and Olsen timely appeal.

## ANALYSIS

SUBLETT

### A. DENIAL OF MOTION TO SEVER TRIALS

¶34 Sublett first contends that the trial court erred by denying his motion to sever his trial from Olsen's trial, asserting that Olsen's antagonistic defense unfairly prejudiced his right to a fair trial. The State asserts that the trial court properly denied the motion to sever because Sublett and Olsen did not have mutually inconsistent defenses. We agree with the State.

¶35 Separate trials are not favored in Washington. *State v. Dent*, 123 Wn.2d 467, 484, 869 P.2d 392 (1994) (citing *State v. Grisby*, 97 Wn.2d 493, 506, 647 P.2d 6 (1982), *cert denied*, 459 U.S. 1211 (1983)). We review a trial court's denial of a motion to sever for manifest abuse of discretion.

180

*Dent*, 123 Wn.2d at 484. Defendants seeking severance have the burden of demonstrating that a joint trial " 'would be so manifestly prejudicial as to outweigh the concern for judicial economy.' " *State v. Medina*, 112 Wn. App. 40, 52, 48 P.3d 1005 (quoting *State v. Bythrow*, 114 Wn.2d 713, 718, 790 P.2d 154 (1990)), *review denied*, 147 Wn.2d 1025 (2002).

¶36 A defendant may demonstrate prejudice by showing " 'antagonistic defenses conflicting to the point of being irreconcilable and mutually exclusive.' " *State v. Canedo-Astorga*, 79 Wn. App. 518, 528, 903 P.2d 500 (1995) (quoting *United States v. Oglesby*, 764 F.2d 1273, 1276 (7th Cir. 1985)), *review denied*, 128 Wn.2d 1025 (1996). "But mutually antagonistic defenses are not per se prejudicial as a matter of law." *State v. Johnson*, 147 Wn. App. 276, 284, 194 P.3d 1009 (2008) (citing *Grisby*, 97 Wn.2d at 507), *review denied*, 165 Wn.2d 1050 (2009). And "[t]he mere existence of antagonism between defenses 'or the desire of one defendant to exculpate himself by inculpating a codefendant . . . is insufficient to [compel separate trials].' " *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 712, 101 P.3d 1 (2004) (alterations in original) (footnote omitted) (quoting *United States v. Throckmorton*, 87 F.3d 1069, 1072 (9th Cir. 1996), *cert. denied*, 519 U.S. 1132 (1997)). Instead, a defendant must " 'demonstrate[ ] that the conflict is so prejudicial that . . . the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.' " *Grisby*, 97 Wn.2d at 508 (quoting *United States v. Davis*, 623 F.2d 188, 194-95 (1st Cir. 1980)).

¶37 Here, Olsen's defense was that Totten's murder had occurred before he participated in the robbery of the home and in the disposal of his body, whereas Sublett's defense was a general denial of any involvement in the crime. Although Olsen's defense attempted to shift the blame to Sublett and Frazier, this conflict alone did not rise to the level that a jury would unjustifiably infer that both Olsen and Sublett were guilty. *Grisby*, 97 Wn.2d at 508. Further, the defenses were not irreconcilable because the jury was free to disbelieve both versions of the events. "For defenses

to be irreconcilable, they must be 'mutually exclusive to the extent that one [defense] must be believed if the other [defense] is disbelieved.'" *Johnson*, 147 Wn. App. at 285 (alterations in original) (quoting *State v. McKinzy*, 72 Wn. App. 85, 90, 863 P.2d 594 (1993)). Accordingly, the trial court did not err by denying Sublett's motion to sever his trial from Olsen's.

## B. RIGHT TO A PUBLIC TRIAL/RIGHT TO BE PRESENT

¶38 Sublett next contends that the trial court erred when it held an in-chambers conference in response to a question the jury submitted during its deliberations.[3] Specifically, Sublett contends that the trial court's in-chambers conference violated his right to an open and public trial and violated his right to be present. We disagree.

¶39 The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee criminal defendants the right to a public trial. *State v. Wise*, 148 Wn. App. 425, 433, 200 P.3d 266 (2009). We review de novo whether a trial court has violated a defendant's public trial right. *State v. Brightman*, 155 Wn.2d 506, 514, 122 P.3d 150 (2005).

¶40 Whether a defendant's public trial right applies in the context of an in-chambers conference to answer a question the jury submitted during its deliberations appears to be an issue of first impression in Washington. In *State v. Sadler*, 147 Wn. App. 97, 114, 193 P.3d 1108 (2008), this court recognized that the public trial right applies to evidentiary phases of the trial as well as other "'adversary proceedings,'" including suppression hearings, during voir dire, and during the jury selection process. (Emphasis and internal quotation marks omitted) (quoting *State v. Rivera*, 108 Wn. App. 645, 652, 32 P.3d 292 (2001)). But this court also determined that "[a] defendant does not . . . have a right to a public hearing on purely ministerial or legal issues that do not require the resolution of disputed facts." *Sadler*, 147 Wn. App. at 114.

---

[3] Olsen joins Sublett's arguments on this issue.

■ ¶41 Here, the trial court's in-chambers conference addressed a jury question regarding one of the trial court's instructions, a purely legal issue that arose during deliberations and that did not require the resolution of disputed facts. Thus, under this court's decision in *Sadler*, the defendants' right to a public trial did not apply in this context. Further, CrR 6.15(f) provides in part that "[the trial] court shall respond to all questions from a deliberating jury in open court *or in writing*." (Emphasis added.) More important, questions from the jury to the trial court regarding the trial court's instructions are part of jury deliberations and, as such, are not historically a public part of the trial. *See, e.g., Clark v. United States*, 289 U.S. 1, 12-13, 53 S. Ct. 465, 77 L. Ed. 993 (1933) (citing *Woodward v. Leavitt*, 107 Mass. 453, 460 (1871); *In re Proceedings to Punish Cochran*, 237 N.Y. 336, 340, 143 N.E. 212 (1924); *People ex rel. Nunns v. County Court*, 188 A.D. 424, 430, 176 N.Y.S. 858 (1919)); *Times Mirror Co. v. United States*, 873 F.2d 1210, 1213 (9th Cir. 1989); *Crowe v. County of San Diego*, 210 F. Supp. 2d 1189, 1196 (S.D. Cal. 2002). Because the public trial right does not apply to a trial court's conference with counsel on how to resolve a purely legal question that the jury submitted during its deliberations, we hold that the trial court did not violate the appellants' public trial right by responding to the jury's question in writing as CrR 6.15(f) provided.

■ ¶42 Similarly, because the in-chambers conference held in response to a jury question was not a critical stage of the proceedings, we hold that the trial court did not violate the appellants' right to be present. A criminal defendant has a constitutional right to be present at every critical stage of the criminal proceedings against him. *State v. Pruitt*, 145 Wn. App. 784, 798, 187 P.3d 326 (2008). A critical stage is one where the defendant's presence has a reasonably substantial relationship to the fullness of his opportunity to defend against the charge. *In re Pers. Restraint of Benn*, 134 Wn.2d 868, 920, 952 P.2d 116 (1998) (quoting *United States v. Gagnon*, 470 U.S. 522, 526, 105 S.

Ct. 1482, 84 L. Ed. 2d 486 (1985)). But in general, in-chambers conferences between the court and counsel on legal matters are not critical stages of the proceedings except when the issues involve disputed facts. *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 306, 868 P.2d 835, 870 P.2d 964, *cert. denied*, 513 U.S. 849 (1994). The in-chambers conference here was not a critical stage of the proceedings because it involved only the purely legal issue of how to respond to the jury's request for a clarification in one of the trial court's instructions. Accordingly, the appellants' right to be present did not apply in this context.

C. Trial Court's Refusal To Clarify a Jury Instruction

¶43 Next, Sublett asserts that the trial court abused its discretion by refusing to answer the jury's question during deliberations because the instruction at issue was ambiguous and misstated the applicable law.[4] The State responds that the jury instruction accurately stated the law. We agree with the State.

¶44 A trial court has discretion whether to give further instructions to a jury after it has begun deliberations. *State v. Ng*, 110 Wn.2d 32, 42, 750 P.2d 632 (1988). But we review claimed errors of law in a jury instruction de novo, evaluating the instruction " 'in the context of the instructions as a whole.' " *In re Pers. Restraint of Hegney*, 138 Wn. App. 511, 521, 158 P.3d 1193 (2007) (quoting *State v. Benn*, 120 Wn.2d 631, 654-55, 845 P.2d 289, *cert. denied*, 510 U.S. 944 (1993)). Jury instructions as a whole must provide an accurate statement of the law and must allow each party to argue its theory of the case to the extent the evidence supports. *Benn*, 120 Wn.2d at 654. Jury instructions are sufficient if they are readily understood and are not misleading to the ordinary mind. *State v. Dana*, 73 Wn.2d 533, 537, 439 P.2d 403 (1968).

¶45 Here, the jury's question to the trial court indicated that it could interpret the sentence, "A person is legally

---

[4] Olsen joins Sublett's arguments on this issue.

accountable for the conduct of another person when he or she is an accomplice of such other person in the commission of the crime," in two ways. CP (Sublett) at 156; CP (Olsen) at 71. The jury indicated that it could interpret "he or she" as referring to the person who may be legally accountable for another person's conduct or it could interpret "he or she" as referring to the person for whom a person may be legally accountable.

¶46 Sublett asserts that only the first interpretation is a correct statement of the law, whereas the State asserts that either interpretation is correct. Even assuming without deciding that only the first interpretation is a correct statement of the law, the trial court properly responded to the jury's question by telling them to reread the instruction at issue because a careful reading of the instruction supports only the jury's first interpretation. Here, the second part of the instruction at issue reads, "[W]hen *he or she* is an accomplice of *such other person.*" CP (Sublett) at 156; CP (Olsen) at 71 (emphasis added). The instruction's use of the phrase "such other person" following "he or she" clearly indicates that "he or she" refers to the "*person* [who may be] legally accountable for the conduct of *another person.*" Because the instruction at issue is not ambiguous and supports only the interpretation that Sublett concedes on appeal is a correct statement of law, the trial court did not abuse its discretion by refusing to further clarify the instruction for the jury.

### D. Prosecutorial Misconduct/Cumulative Error

¶47 Next, Sublett contends that the State committed prosecutorial misconduct during closing argument by misstating the probative value of the DNA evidence and by using a visual aid that misstated the evidence and misled the jury. Sublett asserts that the cumulative effect of these alleged instances of prosecutorial misconduct merits a new trial. We disagree.

¶48 A defendant claiming prosecutorial misconduct bears the burden of establishing the impropriety of the

prosecuting attorney's comments and their prejudicial effect. *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997), *cert. denied*, 523 U.S. 1007 (1998). We review a prosecutor's allegedly improper comments in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given. *State v. Russell*, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994), *cert. denied*, 514 U.S. 1129 (1995).

¶49 In determining whether prosecutorial misconduct occurred, we first evaluate whether the prosecuting attorney's comments were improper. *State v. Reed*, 102 Wn.2d 140, 145, 684 P.2d 699 (1984). If the prosecuting attorney's statements were improper and the defendant made a proper objection to the statements, then we consider whether there was a substantial likelihood that the statements affected the jury's verdict. *Reed*, 102 Wn.2d at 145. Absent a proper objection and a request for a curative instruction, the defense waives a prosecutorial misconduct claim unless the comment was so flagrant or ill intentioned that an instruction could not have cured the prejudice. *State v. Charlton*, 90 Wn.2d 657, 661, 585 P.2d 142 (1978). In reviewing a prosecutorial misconduct claim, we generally afford the State great latitude in making arguments to the jury. *State v. Gregory*, 158 Wn.2d 759, 860, 147 P.3d 1201 (2006).

¶50 Sublett first contends that the prosecutor committed misconduct by misstating the probative value of the DNA evidence at closing. Specifically, Sublett contends that the prosecutor's remark that there was a 1 in 130 chance that Sublett contributed the DNA sample found on the bat misstated the evidence because the expert witness testified that 1 in every 130 individuals in the United States population could be a possible contributor. Because Sublett did not object to this remark and did not ask for a curative instruction, he waives any prosecutorial misconduct claim unless the comment was so flagrant or ill intentioned that an instruction could not have cured the prejudice. *Charlton*, 90 Wn.2d at 661. Even assuming that the prosecutor's

remark at closing was improper, Sublett does not argue that a curative instruction would have been insufficient to cure any resulting prejudice. He thus fails to meet his burden of establishing prosecutorial misconduct. *State v. Hoffman*, 116 Wn.2d 51, 93, 804 P.2d 577 (1991).

¶51 Sublett next contends that the prosecutor committed misconduct by using a visual aid that "apparently altered a photograph [of the defendants], inserting the word guilty." Br. of Appellant (Sublett) at 24. Defense counsel objected. The trial court sustained the objection and excluded the image. Sublett has not provided this court with the visual aid and the record is insufficient to allow further review.[5] RAP 9.2(b); *see also State v. Rienks*, 46 Wn. App. 537, 544-45, 731 P.2d 1116 (1987) (Appellant has the burden of perfecting the record so that the reviewing court has before it all of the evidence relevant to the issue, and matters not in the record will not be considered on appeal.). Moreover, Sublett provides no legal argument or citations to authority to support this claim that the excluded photos irreparably precluded a fair trial.[6] Without argument or authority to support it, an assignment of error is waived. *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004) (citing *Smith v. King*, 106 Wn.2d 443, 451-52, 722 P.2d 796 (1986)). Because Sublett has failed to establish prosecutorial misconduct, we do not address his cumulative error claim.

---

[5] The record of proceedings contains no indication as to the nature of the allegedly improper visual aid apart from Sublett's statement at sentencing that he was going to appeal his conviction based in part on the "[prosecutor's] use of visual graphics that displayed my image with a red circle around that image with arrows pointing to me with the word guilty in bold red letters across my face." 11 RP at 1151-52.

[6] The entirety of Sublett's argument on this issue reads:

In addition, the prosecutor used inadmissible visual aids—misstating the evidence and misleading the jury. For example, the prosecutor apparently altered a photograph, inserting the word guilty. Taken as a whole, these improper tactics rendered Sublett's trial unfair.

Br. of Appellant (Sublett) at 24.

## E. Offender Score Calculation

¶52 Last, Sublett contends that the trial court erred at sentencing when calculating his offender score. Specifically, Sublett argues that the trial court erred when it found that his prior out-of-state convictions were comparable to strike offenses for purposes of the POAA. RCW 9.94A.570; former RCW 9.94A.030(29) (2006). Because the elements of Sublett's out-of-state convictions are substantially similar to the elements of a Washington strike offense under the POAA, we disagree and affirm Sublett's sentence.

¶53 A sentencing court may not count an offender's out-of-state conviction as a strike offense unless the State proves by a preponderance of the evidence that the conviction would be a strike offense under the POAA. *State v. Ford*, 137 Wn.2d 472, 479-80, 973 P.2d 452 (1999); *State v. Rudolph*, 141 Wn. App. 59, 71-72, 168 P.3d 430 (2007) (defendant does not have a right to have a jury determine fact of prior conviction for POAA sentence), *review denied*, 163 Wn.2d 1045 (2008). Washington courts employ a two-part test to determine whether foreign convictions are comparable to Washington strike offenses. *In re Pers. Restraint of Lavery*, 154 Wn.2d 249, 255, 111 P.3d 837 (2005). First, the trial court must compare the elements of the foreign crime to determine if they are substantially similar to the elements of a Washington criminal statute in effect when the foreign crime was committed. *In re Lavery*, 154 Wn.2d at 255 (citing *State v. Morley*, 134 Wn.2d 588, 605-06, 952 P.2d 167 (1998)). If the elements of the foreign conviction are comparable to the elements of a Washington strike offense on their face, the foreign conviction counts toward the defendant's offender score. *In re Lavery*, 154 Wn.2d at 255. If the elements of the Washington crime and the foreign crime are not substantially similar, the trial court may "look at the defendant's conduct, as evidenced by the indictment or information, to determine if the conduct itself would have violated a comparable Washington statute." *In re Lavery*, 154 Wn.2d at 255.

▉▉ ¶54 Here, the trial court based Sublett's offender score calculation on his prior California second degree robbery convictions: Sublett was convicted of three counts of second degree robbery on January 28, 1994 and he was convicted of two counts of second degree robbery on March 17, 1997. The trial court found Sublett's prior California second degree robbery convictions comparable to the elements of Washington's second degree robbery, which is a strike offense under the POAA. RCW 9.94A.570; former RCW 9.94A.030(29)(o).

¶55 California Penal Code section 211 provides:

Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.

¶56 California Penal Code section 212.5 defines "second degree robbery" as any robbery other than those listed in subsections 212.5(a) and (b). Washington courts have interpreted "feloniously" to mean " 'with intent to commit a crime.' " *State v. Nieblas-Duarte*, 55 Wn. App. 376, 381, 777 P.2d 583 (internal quotation marks omitted) (quoting *State v. Smith*, 31 Wash. 245, 248, 71 P. 767 (1903)), *review denied*, 113 Wn.2d 1030 (1989).

¶57 At the time of Sublett's California convictions for second degree robbery, the Washington statute defining "robbery" required (1) the unlawful taking (2) of personal property (3) from the person of another or in his presence (4) against his will (5) by the use of immediate force, violence, or fear of injury to that person or his property or the person or property of anyone. RCW 9A.56.190. RCW 9A.56.210 provides that a person commits second degree robbery if he commits robbery as defined in RCW 9A.56-.190. Additionally, in order to convict a defendant of second degree robbery in Washington, the State must prove the nonstatutory element of a specific intent to steal. *See In re Lavery*, 154 Wn.2d at 255-56 (" 'our settled case law is clear that "intent to steal" *is* an essential element of the crime of robbery' " (quoting *State v. Kjorsvik*, 117 Wn.2d 93, 98, 812 P.2d 86 (1991))).

¶58 A legal comparison of the elements of second degree robbery in California and Washington illustrates that the two appear essentially identical. Both require (1) a taking (2) of personal property (3) from another person or in his immediate presence (4) against his will (5) by use of force or fear. Both also require a specific intent to steal. It thus appears that the elements of California and Washington second degree robbery are substantially equivalent for purposes of the POAA.

OLSEN

A. "TO-CONVICT" FELONY MURDER JURY INSTRUCTION (INSTRUCTION 15)

¶59 Olsen first contends that the trial court's "to-convict" felony murder jury instruction violated his due process rights by misstating the elements of the offense, thus relieving the State of its burden of proving every element of the offense beyond a reasonable doubt. Specifically, Olsen contends that the challenged jury instruction allowed the jury to find him guilty of felony murder even if it believed that Frazier and Sublett killed or fatally wounded Totten during the course of felonies no longer in progress when they recruited him to help. We disagree.

¶60 Due process requires the State to prove every element of an offense beyond a reasonable doubt. U.S. CONST. amend. XIV; *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). Jury instructions that relieve the State of its burden to prove every element of an offense violate due process. *Thomas*, 150 Wn.2d at 844. Because jury instructions that omit elements of the crime charged constitute a "manifest error affecting a constitutional right," we may consider the issue for the first time on appeal. RAP 2.5(a)(3); *State v. Chino*, 117 Wn. App. 531, 538, 72 P.3d 256 (2003). Jury instructions that misstate an element of the charged offense may be harmless if the element is supported by uncontroverted evidence. *State v. Brown*, 147 Wn.2d 330, 341, 58 P.3d 889 (2002) (citing

*Neder v. United States*, 527 U.S. 1, 18, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)).

¶61 The trial court gave the following jury instruction regarding the elements required to convict Olsen of first degree felony murder:

(ALTERNATIAVE [sic] B)

(1) That on or about January 29, 2007, Jerry Totten was killed;

(2) That the defendant or an accomplice was committing or attempting to commit the crime of burglary in the first degree or robbery in the first or second degree.

(3) That the defendant, or another participant, caused the death of Jerry Totten in the course of or in furtherance of such crime or in immediate flight from such crime;

(4) That Jerry Totten was not a participant in the crime; and

(5) That the acts occurred in the State of Washington.

CP (Olsen) at 64.

¶62 Olsen contends for the first time on appeal that the trial court should have explained to the jury that it could find him guilty of felony murder only if he was an accomplice to the specific burglary or robbery in progress when Totten was killed or fatally wounded. Olsen further contends that the trial court should have instructed the jury on when a burglary or robbery terminates. But Olsen's contentions fail for three reasons. First, Olsen did not object to the giving of this instruction as CrR 6.15(c) requires.[7] *State v. Ermert*, 94 Wn.2d 839, 621 P.2d 121 (1980). Second, there was no evidence at trial that Totten was killed during the course of a burglary or robbery that had terminated

---

[7] CrR 6.15(c) states:

Before instructing the jury, the court shall supply counsel with copies of the proposed numbered instructions, verdict and special finding forms. The court shall afford to counsel an opportunity in the absence of the jury to object to the giving of any instructions and the refusal to give a requested instruction or submission of a verdict or special finding form. The party objecting shall state the reasons for the objection, specifying the number, paragraph, and particular part of the instruction to be given or refused. The court shall provide counsel for each party with a copy of the instructions in their final form.

before Olsen's participation in a separate burglary or robbery. And third, a trial court errs by giving a jury instruction not supported by the evidence. *State v. Hunter*, 152 Wn. App. 30, 44, 216 P.3d 421 (2009) (quoting *State v. Warden*, 133 Wn.2d 559, 563, 947 P.2d 708 (1997)), *review denied*, 168 Wn.2d 1008 (2010).

¶63 There was no evidence that Totten was killed during or in immediate flight from a completed robbery or burglary before Olsen's participation. Thus, the trial court's "to-convict" instruction accurately stated the elements required for the jury to convict Olsen of felony murder. Accordingly, the trial court's jury instructions did not violate Olsen's due process rights by misstating an element of the offense charged.

## B. TRIAL COURT'S FAILURE TO INSTRUCT ON LESSER INCLUDED OFFENSE OF SECOND DEGREE MANSLAUGHTER/INEFFECTIVE ASSISTANCE OF COUNSEL

¶64 Next Olsen contends that the trial court's refusal to instruct the jury on the lesser included offense of second degree manslaughter violated Olsen's due process rights under the State and Federal constitutions. We disagree.

¶65 A criminal defendant is entitled to a jury instruction on a lesser included offense if (1) each element of the lesser offense is a necessary element of the charged offense and (2) the evidence supports an inference that only the lesser crime was committed. *State v. Huyen Bich Nguyen*, 165 Wn.2d 428, 434, 197 P.3d 673 (2008). In determining whether it is appropriate to give an instruction on a lesser included offense, the trial court views the evidence in a light most favorable to the defendant. *State v. Pittman*, 134 Wn. App. 376, 385, 166 P.3d 720 (2006) (citing *State v. Fernandez-Medina*, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000)). Manslaughter is a lesser included offense of premeditated murder. *State v. Schaffer*, 135 Wn.2d 355, 357-58, 957 P.2d 214 (1998). A person commits second degree manslaughter when, with criminal negligence, he causes the death of another person. RCW 9A.32.070.

¶66 Olsen asserts that he was entitled to a jury instruction on second degree manslaughter because his testimony at trial established that he was unsure whether Totten was already dead or still alive when he joined in the robbery. Olsen contends that, based on this testimony, a jury could find him guilty of second degree manslaughter based on his failure to summon aid under RCW 9.69.100.[8] But even viewing the evidence in a light most favorable to Olsen, he did not demonstrate that he was entitled to the lesser included instruction. Olsen did not provide any evidence that Totten was alive when he first saw him tied to a chair with only his foot protruding through a blanket. Instead, Olsen testified that he did not participate in any assault against Totten and that he did not know whether Totten was dead or alive when he joined in the robbery. Because Olsen did not testify that Totten was alive when he participated in the robbery and did not present any other evidence establishing that Totten was alive before his participation in the crime, his testimony was essentially a denial that he participated in Totten's murder. Accordingly he was not entitled to a jury instruction on the lesser included offense of second degree manslaughter.[9]

¶67 Moreover, even if Olsen presented some evidence that Totten had been assaulted by others but was still alive when he began to participate in the first degree robbery or first degree burglary, he would still not be entitled to a second degree manslaughter instruction. By Olsen's account, Totten died as a result of Olsen's accomplices' conduct while he participated in an ongoing first degree robbery or burglary occurring at some time betweenwhen he first saw Totten tied to a chair under a blanket and when he helped to dispose of

---

[8] RCW 9.69.100 imposes a legal duty on people who witness a violent offense and provides in part that any person "who witnesses the actual commission of . . . [a] violent offense as defined in RCW 9.94A.030 . . . shall as soon as reasonably possible notify the prosecuting attorney, law enforcement, medical assistance, or other public officials."

[9] Because Olsen was not entitled to a second degree manslaughter jury instruction, we need not address his argument that his defense counsel was ineffective for proposing a nonstandard second degree manslaughter instruction or his argument that the trial court violated his due process rights by failing to give the instruction.

Totten's body. But manslaughter is not a lesser included offense of felony murder. *State v. Berlin*, 133 Wn.2d 541, 550, 947 P.2d 700 (1997). The record reveals no basis for the trial court's giving a second degree manslaughter instruction.

¶68 Olsen also contends that his counsel was ineffective for failing to request an instruction on the inferior degree offense of second degree murder. We disagree. Olsen did not claim that he intentionally killed Totten but did not premeditate the killing and no other evidence supports such analysis. Olsen denied any participation in Totten's murder and asserted as defense his negligent or reckless failure to provide medical aid. Accordingly, the evidence did not support a second degree murder instruction and Olsen's defense counsel was not ineffective for failing to request it. *State v. Peterson*, 133 Wn.2d 885, 891, 948 P.2d 381 (1997) (jury instruction on inferior degree offense not warrented unless there is evidence that defendant committed only the inferior offense).

C. NEWLY DISCOVERED EVIDENCE

¶69 Next, Olsen asserts that the trial court erred by denying his CrR 7.5 motion for a new trial based on newly discovered evidence. We disagree.

¶70 CrR 7.5(a) provides in part:

**Grounds for New Trial.** The court on motion of a defendant may grant a new trial for any one of the following causes when it affirmatively appears that a substantial right of the defendant was materially affected:

. . . .

(3) Newly discovered evidence material for the defendant, which the defendant could not have discovered with reasonable diligence and produced at the trial;

. . . .

When the motion is based on matters outside the record, the facts shall be shown by affidavit.

¶71 We review a trial court's denial of a motion for a new trial for an abuse of discretion. *State v. Burke*, 163 Wn.2d 204, 210, 181 P.3d 1 (2008). To obtain a new trial based on newly discovered evidence, a defendant must demonstrate that the evidence (1) will probably change the result

of the trial, (2) was discovered after the trial, (3) could not have been discovered before trial by the exercise of due diligence, (4) is material, and (5) is not merely cumulative or impeaching. *State v. Roche*, 114 Wn. App. 424, 435, 59 P.3d 682 (2002) (citing *State v. Swan*, 114 Wn.2d 613, 641-42, 790 P.2d 610 (1990), *cert. denied*, 498 U.S. 1046 (1991)). The absence of any of these five factors is grounds to deny a new trial. *Roche*, 114 Wn. App. at 435 (citing *State v. Williams*, 96 Wn.2d 215, 223, 634 P.2d 868 (1981)).

¶72 To support his motion for a new trial, Olsen presented the affidavit of Katrina Berchtold (also known as Alexis Cox). In her affidavit, Berchtold asserts that Frazier had told her about her and Sublett's plans to kill Totten because Totten was involved with child pornography. Berchtold also denied that Olsen and Sublett came to her apartment on January 29, 2008,[10] and smoked methamphetamine.

¶73 Here, Berchtold's affidavit does not support a motion for a new trial because the purported evidence does nothing more than impeach Frazier's testimony. Further, because defense counsel thoroughly impeached Frazier during its cross-examination, it is unlikely that any additional attack on Frazier's credibility would have changed the result of the trial. Here, defense counsel's cross-examination of Frazier revealed that she told several lies in the days surrounding Totten's murder, including accusing Totten of being a child molester. Because Olsen fails to demonstrate how this newly discovered evidence would change the result of his trial and fails to show how the evidence is not merely cumulative or impeaching, the trial court did not err in denying his motion for a new trial.

D. ER 404(b) EVIDENCE

¶74 Next, Olsen contends that the trial court violated ER 404(b) by admitting unedited recordings of telephone calls

---

[10] Olsen's defense attorney at trial asserted that this date was a typographical error.

between him and Frazier. The State concedes that the trial court erred by failing to conduct an analysis on the record when it found the evidence admissible under ER 404(b) but asserts that the error was harmless. We agree with the State.

¶75 We will not disturb a trial court's ruling under ER 404(b) absent a manifest abuse of discretion such that no reasonable judge would have ruled as the trial court did. *State v. Mason*, 160 Wn.2d 910, 933-34, 162 P.3d 396 (2007), *cert. denied*, 553 U.S. 1035 (2008). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995).

¶76 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with it. ER 404(b). It may be admissible for other purposes, such as proof of motive, plan, preparation, intent, or identity, but before a trial court may admit such evidence, it must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect. *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002). The trial court must conduct this analysis on the record. *State v. Lillard*, 122 Wn. App. 422, 431, 93 P.3d 969 (2004) (citing *State v. Jackson*, 102 Wn.2d 689, 694, 689 P.2d 76 (1984)), *review denied*, 154 Wn.2d 1002 (2005).

¶77 Although Olsen does not specifically identify which bad acts were contained in the phone conversations that he objected to, a review of the phone transcript shows that the following was discussed:

[Olsen]: Oh, I didn't believe he was getting her, but I thought for real, that I mean, the way he was acting was a little bit on the questionable side.

[Frazier]: Do something (inaudible)

[Olsen]: If I'd a done something to that boy that night, I'd a blown that mother fucker's brains out all over that motel room.

[Frazier]: I had the fucking bullets. Hello?

[Olsen]:   Check this out. I try, I tried to stab that son-of-a-bitch in the Super 8 Motel room the night before I got arrested.

Ex. 178A at 9.

¶78 The transcript of the telephone calls also showed Olsen and Frazier discussing past drug use and plans to use drugs in conjunction with the "job" Frazier was offering Olsen. Here, the trial court erred by failing to conduct the ER 404(b) balancing analysis on the record. But where the trial court fails to conduct an ER 404(b) analysis on the record, the error is harmless unless the failure to do the balancing, within reasonable probability, materially affected the outcome of the trial. *State v. Halstien*, 122 Wn.2d 109, 127, 857 P.2d 270 (1993) (citing *State v. Tharp*, 96 Wn.2d 591, 599, 637 P.2d 961 (1981)).

¶79 Here, the trial court's failure to conduct a balancing analysis on the record was harmless because the evidence was admissible under the ER 404(b) res gestae exception. Under the res gestae exception to ER 404(b), "evidence of other crimes or bad acts is admissible to complete the story of a crime or to provide the immediate context for events close in both time and place to the charged crime." *Lillard*, 122 Wn. App. at 432. Unlike most ER 404(b) evidence, res gestae evidence is not evidence of unrelated prior criminal activity but is itself a part of the crime charged. Here, Olsen's telephone conversation with Frazier was evidence of the preparation, intent, and Olsen's motive (to get bail money).

¶80 At issue were Olsen's statements in the phone conversation in which the State alleged Frazier recruited Olsen. The conversation took place one day before Olsen was bailed out and Totten murdered; it appears that Olsen was boasting about his past criminal activity to induce Frazier to bail him out and let him work on a "job" for her and Sublett. Under the State's theory of the case, the "job" being discussed involved the robbery or burglary of Totten. The conversation thus constituted planning evidence relevant to establish an essential element of the State's case.

"ER 404(b) is not designed 'to deprive the State of relevant evidence necessary to establish an essential element of its case,' but rather to prevent the State from suggesting that a defendant is guilty because he or she is a criminal-type person who would be likely to commit the crime charged." *State v. Foxhoven*, 161 Wn.2d 168, 175, 163 P.3d 786 (2007) (quoting *State v. Lough*, 125 Wn.2d 847, 859, 889 P.2d 487 (1995)).

¶81 Under the State's theory of the case, Olsen agreed to participate in a "job" to rob or burglarize Totten in order to get Frazier to bail him out of jail; Olsen's specific statement that he tried to stab someone the night before he was arrested was admissible to rebut his defense that he believed Frazier was offering him a legitimate construction job. *See, e.g., United States v. Keeper*, 977 F.2d 1238, 1241 (8th Cir. 1992) (evidence of two earlier searches that revealed cocaine relevant to rebut Keeper's defenses that he did not possess or intend to distribute cocaine found in bedroom of his residence and that police had targeted wrong person); *State v. Wilson*, 60 Wn. App. 887, 891, 808 P.2d 754 (evidence of defendant's alleged prior assaults on victim admissible not only to explain victim's delay in reporting sexual abuse but also to rebut implication that molestation did not occur), *review denied*, 117 Wn.2d 1010 (1991).

¶82 Additionally, any reference to Olsen's drug use did not, within a reasonable probability, materially affect the outcome of the trial because Olsen admitted to his extensive drug use in his interviews to police as well as in his testimony at trial. Accordingly, we hold that the trial court's failure to conduct an ER 404(b) analysis on the record was harmless error.

E. Due Process Right To Present a Defense

¶83 Last, Olsen asserts that the trial court violated his due process right to present a defense by excluding portions of the proffered testimony of Totten's former neighbor, Rayan. The State responds that the trial court properly excluded portions of Rayan's testimony because they were not relevant and were inadmissible hearsay. We agree with the State.

¶84 A criminal defendant has a constitutional right to present relevant, admissible evidence in his defense. *State v. Rehak*, 67 Wn. App. 157, 162, 834 P.2d 651 (1992), *review denied*, 120 Wn.2d 1022, *cert. denied*, 508 U.S. 953 (1993). The United States Supreme Court has stated, "Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967). But the right of a criminal defendant to present evidence is not unfettered and the refusal to admit evidence lies largely within the sound discretion of the trial court. *Rehak*, 67 Wn. App. at 162. We review a trial court's decision to admit or refuse evidence under an abuse of discretion standard. *Powell*, 126 Wn.2d at 258. A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. *Powell*, 126 Wn.2d at 258.

¶85 Here, the trial court allowed Rayan to testify regarding Totten's asking him for advice on obtaining a restraining order but did not allow him to testify that Totten sought the restraining order against Frazier because he suspected she had been stealing from him. Olsen asserts that this evidence was admissible under the state of mind hearsay exception to show the plan to evict Frazier from his property and, thus, was relevant to show Frazier's plan to murder Totten. ER 803(a)(3).

¶86 "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence. ER 401. ER 402 provides, "All relevant evidence is admissible, except as limited by constitutional requirements or as otherwise provided by statute, by these rules, or by other rules or regulations applicable in the courts of this state. Evidence which is not relevant is not admissible." Here, Totten's plan to evict Frazier was not relevant to any fact of consequence

because, absent evidence that he had communicated his intention to Frazier, it does not provide any motive for Frazier to murder him and, thus, does not support the defense's theory that Frazier and Sublett had murdered Totten before Olsen participated in the robbery. Moreover, even if Totten's state of mind were relevant, statements discussing the conduct of another person that may have created the declarant's state of mind are inadmissible under ER 803(a)(3). *State v. Parr*, 93 Wn.2d 95, 104, 606 P.2d 263 (1980). Thus, under the state of mind hearsay exception, Totten's statements regarding his suspicions that Frazier had been stealing from him were not admissible. Accordingly, the trial court did not err by excluding portions of Rayan's testimony that were not relevant and it did not violate Olsen's due process right to present a defense.

SUBLETT'S SAG

¶87 In his SAG, Sublett presents a number of arguments that we cannot address in his direct appeal because they require examination of matters outside the record. For instance, Sublett asserts that the trial court erred by refusing to admit a January 25, 2007 and January 27, 2007 phone conversation between Olsen and Frazier while Olsen was incarcerated on an unrelated charge. But the content of these conversations was not made part of the trial record. For this same reason, we cannot address Sublett's claims (1) that his attorney did not allow him to testify, (2) that his attorney was ineffective for failing to admit a signed statement by Olsen's cellmate that implicated Olsen in Totten's murder, and (3) that the prosecutor committed misconduct at closing by showing the jury the defendants' photos with the word "guilty" superimposed over their faces.

¶88 Sublett also contends that we should reverse his conviction because the State failed to inform his defense counsel about Berchtold, who Sublett claims was a "potential critical witness." SAG at 1. To the extent that Sublett is arguing that the State committed a *Brady* violation by suppressing exculpatory evidence, his claim lacks merit.

¶89 In *Brady v. Maryland*, 373 U.S. 83, 86, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the United States Supreme Court held that a prosecutor's suppression of an accomplice's confession to murder violated the defendant's due process rights under the Fourteenth Amendment. In holding that the prosecution deprived the defendant of due process, the Supreme Court announced the rule that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.

■■ ■■ ¶90 There are three components to a *Brady* violation: (1) the evidence at issue must be favorable to the accused, because it is either exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material, meaning that the evidence must have resulted in prejudice to the accused. *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). Prejudice occurs " 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Strickler*, 527 U.S. at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985)). Prejudice is determined by analyzing the evidence withheld in light of the entire record. *In re Pers. Restraint of Sherwood*, 118 Wn. App. 267, 270, 76 P.3d 269 (2003) (citing *Benn v. Lambert*, 283 F.3d 1040, 1053 (9th Cir.), *cert. denied*, 537 U.S. 942 (2002)). " 'A *Brady* violation does not arise if the defendant, using reasonable diligence, could have obtained the information' at issue." *In re Benn*, 134 Wn.2d at 916 (quoting *Williams v. Scott*, 35 F.3d 159, 163 (5th Cir. 1994)).

■■ ¶91 As we noted above, Berchtold's affidavit indicates that had the defense called her as a witness, she would have testified that Frazier had told her that she and Sublett were planning to kill Totten. Because this purported evidence implicates Sublett in the premeditated murder of Totten, it is not favorable to his defense. Thus,

even assuming that he can demonstrate the remaining *Brady* violation components, his claim fails.

¶92 Affirmed.

HUNT, J., and HOUGHTON, J. PRO TEM., concur.

Reconsideration granted and opinion modified June 29, 2010.

Review granted at 170 Wn.2d 1016 (2010).